## THE VINCES.

District Court, E. D. South Carolina. June 13, 1927.

No. 928.

1. **Customs duties ⊜133(6)—Evidence held to show liquor-laden vessel 7½ miles from land when challenged, and between 12 and 13 miles from land when actually seized.**

In libel of vessel and cargo for fraudulently attempting to import liquor into United States, evidence *held* to establish that vessel was within 7½ miles from land when challenged by Coast Guard, and between 12 and 13 miles from land when actually seized.

2. *Customs duties ⊜133(6)—Evidence held to show that liquor laden vessel was bound for the United States before challenge and seizure.*

In libel of vessel and cargo for fraudulently attempting to import liquor into United States, evidence *held* to establish that vessel, before challenge and seizure by Coast Guard, was bound for the United States.

3. **Customs duties ⊜126—Seizure over 12 miles from shore of liquor vessel, which was first challenged 7½ miles from shore held not unlawful (Tariff Act 1922, § 581 [Comp. St. § 5841h]).**

Where liquor-laden vessel was challenged by Coast Guard when 7½ miles from land, but took flight and was not actually seized until between 12 and 13 miles out, *held*, under Tariff Act 1922, § 581 (Comp. St. § 5841h), seizure was not unlawful, nor violative of Treaty with Great Britain of May 22, 1924 (43 Stat. 1761).

4. **United States ⊜2—Territory subject to jurisdiction of United States includes land under its dominion, etc., and marginal belt of a marine league, though high seas are common property of nations.**

Territory subject to jurisdiction of the United States includes the land areas under its dominion and control, the ports, harbors, bays, and other inclosed arms of the sea along the coast, and a marginal belt of sea extending from the coast line outward a marine league, or 3 geographical miles, but the high seas are common property of all nations.

5. **International law ⊜7—Nation having absolute authority within its own territory must act with due regard to rights of other nations on high seas.**

The authority of a nation within its own territory is absolute and exclusive, but on the high seas a nation must act with due regard to the rights of other nations therein.

6. **International law ⊜7—Every nation has inherent right to protect itself and enforce its laws by exercise of authority on high seas.**

Every nation has the inherent right to protect itself and to provide for the enforcement of its laws and the security of its territorial jurisdiction, and in so doing may exercise an authority on the high seas beyond the 3-mile limit.

7. **Customs duties ⊜10—Statutory provision affecting seizure of liquor-laden vessels within 12-mile limit held not abrogated by treaty with Great Britain (Tariff Act 1922, § 581 [Comp. St. § 5841h]).**

Treaty with Great Britain May 22, 1924, art. 2 (43 Stat. 1761), intended to enlarge rights of the United States, did not abrogate Tariff Act 1922, § 581 (Comp. St. § 5841h), relating to seizure of liquor-laden vessels within 12-mile limit.

8. **Customs duties ⊜12—Laws to prevent fraud on revenue of United States, though they impose penalties and forfeitures, are to be construed fairly and reasonably, not strictly.**

Statutes to prevent frauds on the revenue of the United States are considered as enacted for the public good, and, although they may impose penalties and forfeitures, are not to be construed, like other penal laws, strictly in favor of defendant, but are to be construed fairly and reasonably, to carry out the intent of the Legislature.

9. **Customs duties ⊜124—Clearance paper produced by liquor-laden vessel held not manifest required by statute (Tariff Act 1922, §§ 431, 584 [Comp. St. §§ 5841e, 5841h3]).**

Clearance paper produced by master of liquor-laden vessel *held* not such a manifest as was required by Tariff Act 1922, § 431 (Comp. St. § 5841e), failure to produce which is penalized by section 584 (Comp. St. § 5841h3).

10. **Customs duties ⊜129—Liquor-laden vessel held not exempt from penalty for failure to produce manifest, on ground that manifest was not demanded within 12-mile limit (Tariff Act 1922, §§ 431, 584, 594 [Comp. St. §§ 5841e, 5841h3, 5841h14]).**

Liquor-laden vessel, challenged by Coast Guard 7½ miles from shore, but not actually apprehended until between 12 and 13 miles from shore, *held* not exempt from penalties, under Tariff Act 1922, §§ 584, 594 (Comp. St. §§ 5841h3, 5841h14), for failure to produce manifest required by section 431 (Comp. St. § 5841e), merely because such manifest was not demanded until the vessel was beyond the 12-mile limit.

**11. Customs duties ⊗═129—That liquor-laden vessel bound for United States had not arrived within territorial waters held not to relieve it from liability for failure to produce manifest required of vessels "arriving in the United States" (Tariff Act 1922, §§ 431, 581, 584 [Comp. St. §§ 5841e, 5841h, 5841h3]).**

Under Tariff Act 1922, § 431 (Comp. St. § 5841e), relating to form of manifest required of vessels "arriving in the United States," the mere fact that a liquor-laden vessel bound for the United States had not actually arrived within the territorial waters of the United States, did not relieve it from the penalties, under sections 581 and 584 (Comp. St. §§ 5841h, 5841h3), for failure to produce manifest.

**12. Customs duties ⊗═129, 130(9)—That liquor-laden vessel produced no manifest, rather than false one, held not to preclude forfeiture, or require imposition of $500 penalty only (Tariff Act 1922, §§ 431, 584 [Comp. St. §§ 5841e, 5841h3]).**

Under Tariff Act 1922, § 431 (Comp. St. § 5841e), requiring manifest of vessels arriving in the United States, and section 584 (Comp. St. § 5841h3), imposing penalty of $500 on failure to produce manifest, and providing that, if any merchandise is found on board after unlading, which is not included or described in manifest, such merchandise belonging to the owner shall be subject to forfeiture, the mere fact that a seized liquor-laden vessel did not produce any manifest, rather than false one, did not prevent forfeiture of cargo, or require imposition of $500 penalty only.

**13. Customs duties ⊗═129—Master of liquor-laden vessel held subject to penalty of $500, plus value of cargo, for failure to produce manifest (Tariff Act 1922, §§ 431, 584, 594 [Comp. St. §§ 5841e, 5841h3, 5841h4]).**

Master of liquor-laden vessel, failing to produce manifest required by Tariff Act 1922, § 431 (Comp. St. § 5841e), *held* liable, under section 584 (Comp. St. § 5841h3), for penalty of $500 and an additional penalty to the extent of the value of the cargo, enforceable under section 594 (Comp. St. § 5841h14) by sale of vessel.

**14. Customs duties ⊗═130(9)—Liquor cargo, owned by owner of vessel failing to produce manifest, held subject to forfeiture under statute (Tariff Act 1922, §§ 431, 584 [Comp. St. §§ 5841e, 5841h3]).**

Cargo on liquor-laden vessel failing to produce manifest, which belonged to owner of vessel, *held* subject to forfeiture, under Tariff Act 1922, §§ 431, 584 (Comp. St. §§ 5841e, 5841h3).

**15. Customs duties ⊗═130(11)—Cargo of liquor seized beyond territorial jurisdiction of United States held not subject to forfeiture under statute, because of false statements of master (Tariff Act 1922, § 592 [Comp. St. § 5841h11]).**

Where liquor-laden vessel was challenged by Coast Guard at 7½ miles from shore, but not actually apprehended until between 12 and 13 miles out, *held*, cargo was not subject to forfeiture under Tariff Act 1922, § 592 (Comp. St. § 5841h11), on ground of false statements made by master, inasmuch as that section relates only to merchandise "imported" within the territorial jurisdiction of the United States.

**16. Customs duties ⊗═130(4)—Statute relating to forfeiture of "imported merchandise" does not apply, unless merchandise has actually arrived within territorial jurisdiction of United States (Tariff Act 1922, § 592 [Comp. St. § 5841h11]).**

Tariff Act 1922, § 592 (Comp. St. § 5841h11), relating to forfeiture of "imported merchandise," which any person attempts to introduce into the commerce of the United States by means of fraudulent or false invoice, etc., does not apply, unless the merchandise involved has actually arrived within the territorial jurisdiction of the United States.

**17. Customs duties ⊗═130(11)—Liquor cargo, not brought within territorial jurisdiction of United States before seizure, held not subject to forfeiture as fraudulently imported (Tariff Act 1922, § 593 [Comp. St. §§ 5841h12, 5841h13]).**

Where cargo of liquor was not brought within territorial jurisdiction of the United States before seizure, it was not subject to forfeiture under Tariff Act 1922, § 593 (Comp. St. §§ 5841h12, 5841h13), as fraudulently and knowingly imported.

In Admiralty. Libel by the United States against the schooner Vinces, her engines, etc., and certain intoxicating liquors. Decree for libelant in accordance with opinion.

See, also, 19 F.(2d) 358.

J. D. E. Meyer, U. S. Atty., and Louis M. Shimel, Asst. U. S. Atty., both of Charleston, S. C.

John I. Cosgrove and A. R. McGowan, both of Charleston, S. C., for respondent.

ERNEST F. COCHRAN, District Judge. The United States filed a libel against the schooner Vinces and her cargo. The first cause of action alleges in substance that the Vinces was bound for the United States, and was observed by the United States Coast Guard cutter Mascoutin within 4 leagues of the coast (commonly referred to as the 12-mile limit); that the Mascoutin tried to stop her, but the Vinces attempted to escape, and was thereupon compelled by force to stop; and, upon her manifest being demanded, the master of the Vinces failed to produce any manifest, and there was no manifest aboard. It is also alleged that there was found aboard a cargo of intoxicating liquors and that the master claims the cargo.

The second cause of action alleges that the Vinces was fraudulently endeavoring to import into the United States, within 12 miles of the coast, and within one hour's sailing distance of the United States, certain alcoholic beverages, and that the master and crew attempted to introduce the same into

the commerce of the United States by making certain false and fraudulent statements.

The third cause of action alleges that the Vinces was employed by her master in fraudulently endeavoring to import alcoholic beverages within the territorial jurisdiction of the United States, and within 12 miles of the coast of the United States, and within one hour's sailing distance thereof, and that the master and crew did fraudulently and knowingly import and facilitate transportation of foreign merchandise, to wit, intoxicating liquors, without paying any duty thereon or intending to pay the same.

The libel prays for certain penalties, which are claimed to be a lien upon the vessel, and for a forfeiture of the cargo.

The master of the Vinces filed an answer for and on behalf of the Smart Shipping Company, Limited, of Halifax, Nova Scotia, as the owner of the schooner and cargo, and set forth in substance that the Vinces was not bound for the United States, and did not come within 4 leagues of the United States, or within the jurisdiction of the court. The answer further denies any false statements, and alleges that upon demand of the officers of the Mascoutin the master delivered to them all papers in his possession covering the ship and cargo, and that, not being bound to the United States or a port thereof, it was not necessary that he should have any manifest or like paper, and that the papers delivered were sufficient and in proper form for the voyage he was then engaged on, to wit, from St. Pierre, Miquelon, to Nassau, in the Bahamas. The answer sets forth that the seizure was made beyond the 12-mile limit, and certain other defenses which will be adverted to later.

The cause came on to be heard before me, and a number of witnesses were examined on the part of the government, and considerable documentary evidence submitted. The only witness examined on the part of the claimant was the master of the Vinces. The evidence on the disputed issues of fact was largely of a technical nature, involving expert knowledge of the principles of navigation, and the location of the positions of vessels upon the high seas. In view of the nature of the evidence and importance of the case, I shall, before finding the ultimate facts, discuss the testimony as far as practicable, and state some of the details of the facts, which are either admitted or shown beyond peradventure, in order to set forth as far as practicable my reasons for my findings of the ultimate facts.

The Vinces is of British registry, and has a gross tonnage of 82.42 tons, and a registered tonnage of 58.13 tons, a length of 81 feet, a beam of 22.1 feet, and a depth of 8.5 feet, and was during the time of the transactions involved in this case under the control and direction of her master, Michael Gillam. She is a three-masted schooner, but had additional power furnished by two oil engines of 45 horse power each. Without the aid of her sails, and loaded as she was at the time of seizure, she was capable of making, under the power furnished by her engines, 8½ miles an hour. Under both sails and engines, she was capable of still greater speed.

On February 15, 1927, the Vinces cleared from the port of Halifax, Nova Scotia, with a cargo of intoxicating liquors which she had taken aboard at St. Pierre, Miquelon, ostensibly bound for Nassau, in the Bahamas. She obtained from the Canada customs collector at Halifax a clearance certificate for Nassau, with a cargo stated to consist of 1,709 packages of assorted liquors and 100 kegs of malt. The master of the Vinces testified that he had a manifest of the cargo when he left St. Pierre, but that it was the custom for such manifest to be retained by the customs officer at Halifax. Certainly, after leaving Halifax, he had no manifest for the cargo then on board, nor for the cargo on board at the time of the seizure. Under favorable weather conditions the trip from Halifax to Nassau could have been made by the Vinces in 9 or 10 days. The master testified that he had orders to deliver the cargo then on board to another vessel at a certain point on the high seas. The Vinces did not proceed to Nassau, but about 5 days out from Halifax she met the vessel referred to and delivered to that vessel this cargo, somewhere on the high seas off the coast of the United States. The master of the Vinces testified that he did not known the name of this vessel, the name of her master, nor of her owner.

On March 8 and 9, 1927, the Vinces was observed by the officers of the Coast Guard destroyer Shaw, in company with the Dorothy M. Smart, another schooner, on the high seas, in latitude 37 deg. 49½ min. north, and longitude 71 deg. 34 min., about 125 miles from land, and about 120 miles westward of the course from Halifax to Nassau. At this time and place, the officers of the Shaw testified that a large number of packages of liquor were transferred from the Dorothy M. Smart to the Vinces, and the master of the Vinces admitted that the cargo found aboard the Vinces when she was finally seized was

the same cargo transferred from the Smart. The only reason the master gave for the transfer was that the Smart was not considered quite seaworthy at that time.

One of the government's witnesses, a colored fisherman named Branch, gave testimony which, in the light of subsequent events, appears significant. He testified that he now lives at Charleston, and was a fisherman, and had fished up and down the coast from Massachusetts to Florida for many years, and was thoroughly familiar with the waters of this coast. He said that he left Charleston on the morning of March 14, 1927, on a fishing trip, and about 10 o'clock in the morning, while he was southeast of the Morris Island lighthouse, near Charleston, he sighted a vessel with a very peculiar rig, which he described; that this vessel was between 8 and 9 miles from shore, and that at that point those aboard the vessel, while they might not be able to see land, could certainly see the Morris Island lighthouse. He stated that he had never in all his experience seen a vessel with just the peculiar rig of the one he saw that day, and that this rig was identical with the rig of the Vinces, which he saw afterwards in the port of Charleston. I was very much impressed with the frankness and demeanor of this witness, and his testimony tends very strongly to show that the Vinces was there at that time.

At 8 o'clock on the morning of March 14 the United States Coast Guard cutter Mascoutin left Charleston lightship with a course laid for Martin's Industry Buoy, near Savannah. Her ordinary coursing speed is about 9 miles per hour. The testimony shows she kept what is denominated a "rough" log book, in which are written in pencil the events of the day, her course, etc., and that the custom was to permit changes and erasures in this log. She also kept what is denominated a "smooth" log, written up in pen and ink by the captain from the "rough" log, and other memoranda, and his own knowiedge of the transactions to be recorded. If any changes are made in the "smooth" log, the rule is that the change must be so made as to show what change is made, and initialled by the officer making it. It appears that the smooth log, so far as concerns the transactions now under consideration, was written by the captain the night of the 14th, after the return of the Mascoutin to Charleston. The Mascoutin arrived at Martin's Buoy at 12:33 p. m., but about 4½ miles to the east of the buoy, owing to the current which was setting away from the coast. She came in close to Martin's Buoy and turned for the return trip to Charleston, and set a steering course of 51 deg., which, allowing for deviation, would be 48 true. This course, without any allowance for the current, wind, and other factors, would have kept her within the 12-mile limit and at a distance of 10½ miles from shore at the time and place she first sighted the Vinces in the afternoon of that day. The tide turned about 12 o'clock, and from that time on the current was shoreward. The day was fair, but there was a slight haze.

While the Mascoutin was proceeding upon this course of 48 true, at about 3:52 p. m., she sighted the Vinces astern and to the eastward of her course. The land was not in sight of either vessel. The Vinces was headed northwest, straight to the American shore, in the direction of the mouth of North Edisto river. The Vinces proceeded on this course and crossed the line of the course of the Mascoutin astern, and after crossing continued for about three-quarters of a mile before turning. At about 4 o'clock p. m., the Mascoutin turned eastward and southward to intercept the Vinces. The Mascoutin blew several signals for the Vinces to stop, but, while these signals were heard aboard the Vinces, they were not heeded. The Vinces, instead of stopping, finally turned and headed seaward. The Mascoutin gave chase, and finally got within hailing distance by megaphone, and then the captain of the Mascoutin informed the master of the Vinces that he was within the 12-mile limit and should stop. The master replied that he would not stop unless forced to. The Mascoutin fired several blank shots, but upon these proving ineffective, and the master of the Vinces saying he would not stop unless damaged, a solid shot was fired into the Vinces, but at a place not to injure the crew or to seriously damage the vessel. Thereupon, at 4:55 p. m., the Vinces stopped, and was boarded by some of the officers of the Mascoutin, who demanded her manifest and other ship's papers. The master of the Vinces handed them the clearance paper already mentioned, and stated that that was the only manifest he had, and that it covered the cargo then on board; that he was not bound for the United States, but was bound for Nassau, in the Bahamas; that he did not think he was within the 12-mile limit but was not sure of his position. There was no manifest on board, unless the clearance paper referred to be deemed a manifest.

The Vinces had on board a cargo of intoxicating liquors, partly on deck and partly below, and not under seal as required by the British treaty. The master of the Vinces had no log book, no log line, and made no

claim at that time that he had taken any observations or soundings to ascertain his position. It is fair to note, however, that the testimony showed that vessels of the class of the Vinces frequently had no log book. His answers to questions propounded to him then, and later when taken ashore, were evasive, and the only claim he made was that he was not within the 12-mile limit, and that he was not bound for the Carolina coast, but admitted that he was not sure of his position. The Mascoutin took the Vinces in tow and set a course of 36 deg., which should have brought her up to the Charleston lightship. She actually arrived at the Charleston lightship on this course, with the lightship on her starboard side.

When the Vinces was sighted and captured she was from 40 to 50 miles off the course from Halifax to Nassau. She was equipped with a radio. The radio room was in the cabin, and the two portholes in the fore part of the cabin were covered with canvas, which would permit the radio room to be lighted and the light not show. Certain seals and stamps, which might be used for fabricating a ship's papers, were also found aboard the Vinces.

The main conflict in the testimony revolved around the question whether the Vinces came within the 12-mile limit, or within an hour's sailing distance of the coast, and what her position was at the time of her actual seizure. Stated as briefly as possible, the testimony of the government was to the effect that, taking the course of 48 true, without any allowance for other factors and corrections to be made on their account, the Mascoutin and the Vinces were both well within the 12-mile limit, and that when the proper calculations have been made, and all allowances and corrections made for current, wind, and other factors, the Mascoutin was actually set off of her course several miles to the shoreward, and that the actual course traversed was about 43 true, which according to their calculations, would place the Vinces, where she turned, at certainly within 7½ miles of Seabrook Island, the nearest point of land, and 12¾ miles from shore when captured, and according to the testimony of the expert, who rechecked and made a very complete calculation, she was very likely as close in as 6.9 miles. They also testified that this conclusion was verified by the fact that from the point of actual seizure, according to their log, the course set for the Mascoutin to bring her up to the Charleston lightship actually did so, and that, calculating from that, they establish the point of actual seizure

as 12¾ miles from Seabrook Island. The captain of the Mascoutin testified at one time that the point of seizure was about 14 or 14½ miles from shore, but he stated this as merely his judgment, and did not then give the exact distance by calculation.

As opposed to this, the claimant asserts that the testimony of the officers is to be discounted, because of the fact that the rough log showed certain changes and erasures, and that certain things in the rough log were omitted from the smooth log; that the government failed to produce two witnesses who made some of the entries in the rough log, and that the officers of the Mascoutin have either manipulated their figures or are mistaken. It is also claimed that the testimony of the master of the Vinces shows that he took several observations that day, and took a sounding at the time he turned, which showed him to be beyond the 12-mile limit. These observations were not put down in any log book, but the master of the Vinces says he made them on loose sheets from day to day, and destroyed each day the sheets of the preceding day. These loose sheets, he testified, showed observations taken by him at 8 a. m., at noon, and at 4:05 p. m., and that they established his position as beyond the 12-mile limit, and that he could not have been able to give such figures without having been actually at those points at the time. He did not make any claim at the time of the seizure that he had this data, or that he had made any soundings, nor at any time did he make such claim until the day of the trial. He testified that these sheets were in his pocket at the time of the seizure.

The government in reply introduced expert testimony to show that it was possible for the master of the Vinces, after having an opportunity to come ashore, to manufacture these figures, and give an apparent position to his vessel beyond the 12-mile limit. [1] Upon these conflicting claims, I am satisfied that the great weight of the evidence is in favor of the libelant. I observed the demeanor of all of the witnesses very carefully. I saw nothing in the demeanor of the government's witnesses to indicate that they would be guilty of manipulation of figures to deceive the court. As to the alleged changes in the rough log, it was testified that the rough log, as the name imports, consisted merely of memoranda hastily jotted down and subject, of course, to changes. As to the omission from the smooth log of a statement in the rough log, giving the latitude and longitude of the Vinces at the time of turning, this was satisfactorily explained, as those

figures were based upon the *apparent* position of the Mascoutin, which was subject to correction because of deviation, allowance for current, and other factors, and it was not necessary or advisable for the captain of the Mascoutin, in preparing the smooth log, to include such statement, because it would have been misleading, unless fully explained, as it was by the testimony. As to the apparent change of the course 36 deg. in the rough log from 38, this change was merely the correction of an error, because in numerous other places in the rough log the course is stated at 36, without any evidence of change, and the smooth log places the course at 36 throughout. In addition to this, the change from 36 to 38, as shown by the testimony, would not have affected the result more than half a mile, and therefore could not have placed the Vinces more than half a mile further offshore.

The were only two changes in the smooth log, one duly noted as required by the rule, and both were sufficiently explained. As to the failure of the government to call two witnesses, who made some of the entries in the rough log, it appeared that one of them was on furlough and not available. As to the other witness, who was not called, while I think it would have been better to have called him, I do not think that circumstance should outweigh the very strong evidence and circumstances upon which my conclusions are based. Moreover, final responsibility for the correctness of the smooth log was upon the captain, who did testify and was subject to cross-examination.

On the other hand, the case for the claimant, as made out by the testimony of the master, is subject to grave criticism. The master was, of course, deeply interested, far more interested than the officers of the Mascoutin could possibly have been. His statements at the time of seizure and thereafter were noncommittal, evasive, and entirely lack the frankness of a man who felt that he was right. As to his possession of the papers establishing his position and taking soundings, in view of all the circumstances, I cannot believe that he had these papers in his possession all this time, and would never have said a word about them in defense of his conduct until the very day of the trial. He endeavored to impress the court with the idea that it would have been impossible for him to have made a memorandum of that sort, unless he had been in that position at the time his alleged observations were taken, when, as a matter of fact, it was clearly established that, after coming ashore, he could have made up such papers. This is further evidenced by certain conduct of the master during the course of the trial, which was observed by the court. When the expert for the government was testifying in reply upon this point, the master of the Vinces left the courtroom and came back with a book, and at his suggestion, evidently, there were propounded certain questions to this expert relative to the ability of a person to make the calculations referred to, with an evident purpose to check up from the book the testimony of such witness. The master exhibited anxiety that the government witness should not see this book. No effort was made to introduce the book or to dispute the conclusions of the expert witness, and it was evident to the court at the time that the master of the Vinces knew more about the possibility of manufacturing such papers as the loose leaves he produced than he was willing to admit.

There is one other circumstance that occurred during the course of the trial that should be mentioned. In one or two places in the rough log the course of 36 appeared to have been written over an erasure of 38, although in other portions of the log, in several places, 36 was written with no evidence of erasure. During one of the recesses of the court, after the rough log was placed in evidence, the figure in *one* of these places was written over with an 8, so as to make it 38, but no change was made in any other place. It is evident that this writing of the figure 8 could hardly have been made by an employee of the government, for that would be against the contention of the government, and tend to place the Vinces farther out. In addition to this, as has already been stated, the change to 38 would only change the position of the Vinces half a mile, and could not affect the final result. It has never been ascertained who made this change. I entirely absolve all the attorneys in the cause, and the officers of this court, of any participation in or knowledge of this change. Nor do I think that any of the parties or their witnesses made the change, or, at least, if any of them did so, it was done thoughtlessly, without any intention of imposing upon the court. In fairness to the master of the Vinces, it should be stated that neither he nor his counsel had any access to the rough log during the recess.

There is a very strong point, which, although not adverted to during the argument, confirms the theory of the government. From the time the Vinces turned, at 4:10, until she was captured, at 4:55, she was steering on a straight course and evidently at

full speed, to escape pursuit. In that length of time, with her speed capacity, she could hardly have traversed less than 5 miles, and more probably she traversed as much as 6 miles, before being finally stopped. If the contention of the master of the Vinces is true, that he was beyond the 12-mile limit at the time he turned, or even if it be conceded that he was exactly on the 12-mile limit at that time, he would have been, at the point of capture, 17 or 18 miles offshore. But there is no foundation whatever, anywhere in the testimony, to suppose that he was that far off at that time. If he had been 18, or even 17, miles offshore at the point of capture, the Mascoutin on the course laid for her could never have been brought up to the Charleston lightship, whether that course be deemed 36 or 38.

There can be no possible doubt but that the Vinces came within the 12-mile limit, because she crossed the line of the course of the Mascoutin, which, it is clear, was well within that limit. But, taking all the testimony together and all the circumstances, I am persuaded that the Vinces, at the time of her turning, was at least within 7½ miles of land, but at the time of her actual seizure she was 12¾ miles from land, or possibly 13 miles. [2] The next question is whether the Vinces was bound for the United States. She certainly was not bound for Nassau. The master himself testified that he had never been to Nassau, and when he left Halifax originally his instructions were to meet a vessel on the high seas and deliver his first cargo there. He did say, however, that his instructions were, if he failed to meet that vessel, to proceed to Nassau. He did not know the agent he was to meet in Nassau, the names of any of the consignees, or of any of the parties. As far as knowing what he was to do and with whom he was to communicate when he got to Nassau, he was certainly at sea, literally and figuratively. At the time he was first sighted, he was headed directly for the Carolina coast. He was probably making for the mouth of North Edisto river, or the mouth of Stono river, a little further north. Every circumstance in the case points to the conclusion that he was bound for the United States, and that he intended either to land his cargo of liquors, or some portion thereof, or transfer them to smaller vessels meeting him for that purpose within the territorial waters of the United States.

The testimony shows that the master of the Vinces was a good seaman, and he evidently knew where he was and what he was doing. His only excuse for coming so close inshore was that he did not know his position, and that his water was brackish, and that he desired to keep close to shore for the purpose of establishing his exact position, and of being able to replenish his water supply from shore in case of distress. As to his desire to establish his position, this is absolutely inconsistent with his testimony that he took his position at 8 a. m., again at noon, and again at 4:05 p. m., from celestial observations, and as to the contention that he came in on account of the water supply, it seems to me too trivial for discussion. The evidence showed that the water was not exceptionally bad, possibly a little brackish, and that there was some sediment from rust in the tank.

The government offered testimony to the effect that a certain barge was observed several days prior to March 14 in Williams creek, a branch of Stono river. This barge was equipped with seacocks, which were entirely useless for a barge. She had on board also provisions, gasoline, and numerous other articles for ship's supplies. There was no one aboard her, and she was picketed for several days, but no one ever came aboard. The theory of the government is that this barge had on board these supplies for the purpose of meeting the Vinces and delivering them, and obtaining a cargo of liquor, and that the seacocks were put in her for the purpose of being able to sink her quickly, if she should be caught in tow of another vessel with the liquor on board. The Vinces, however, was well supplied with all of the stores mentioned, and, while is it possible that the master of the Vinces and the owners of the barge intended to make transfer of the supplies to the Vinces, and a part of the liquor to the barge, nevertheless the evidence fails on the part of the government to establish any connection between the two vessels.

There was some conflict as to the ownership of the Vinces and her cargo. While the proof offered in that respect is not as satisfactory as it might be, nevertheless I shall accept the testimony of the master of the Vinces, for the purposes of this case, that both the ship and cargo are owned by the Smart Shipping Company, Limited, of Halifax, Nova Scotia.

In view of the importance of the case, and the very earnest and able argument of counsel for the claimant, I have reviewed the evidence at great length, and at the risk of being quite tedious. A number of other points were adverted to in argument, but, without discussing them in detail, it is suffi-

cient to say that I have considered them all carefully, and they do not shake the conclusions I have reached. The ultimate facts upon which the legal conclusions in this case must rest are as follows:

(1) The schooner Vinces is a vessel of British registry, under the command of Michael Gillam, master, and sailed on February 15, 1927, from Halifax, Nova Scotia, ostensibly bound for Nassau, in the Bahamas, with a cargo of intoxicating liquors on board. She had no manifest for these liquors on board at any time after leaving Halifax.

(2) The Vinces transferred the cargo she had on board when leaving Halifax on the high seas to another vessel, whose name is unknown.

(3) The Vinces, about the 20th or 21st of February, 1927, on the high seas, took on board from another vessel, the Dorothy M. Smart, a cargo of intoxicating liquors.

(4) On March 14, 1927, the Vinces, with this latter cargo of intoxicating liquors on board, was bound for the United States, and was observed by the United States Coast Guard cutter Mascoutin within 12 miles of the coast of the United States, while attempting to land those liquors within the United States.

(5) On March 14, 1927, the Vinces, while bound for the United States, came within 7½ miles and within an hour's sailing distance of the coast of the United States, and then turned and was pursued by the United States Coast Guard cutter Mascoutin, and finally stopped and seized at a point beyond the 12-mile limit, to wit, at a point about 12¾ or 13 miles from the coast, and more than an hour's sailing distance from the coast.

(6) When the Vinces was finally seized beyond the 12-mile limit, the officers of the United States Coast Guard cutter demanded her manifest and other papers, but the master of the Vinces produced no manifest of the cargo of intoxicating liquors which she then had on board, and there was no such manifest on board.

(7) The master of the Vinces, when the Vinces was seized, falsely stated to the officers of the Mascoutin that the clearance paper which he produced and delivered to them was a manifest and covered the cargo of intoxicating liquors then on board, and also falsely stated that he was not bound for the United States, but was bound for Nassau, and he knew when he made those statements that they were untrue.

(8) The cargo of intoxicating liquors found on board at the time of seizure was not under seal, as required by the British treaty with the United States.

(9) The Vinces, with the cargo of liquor on board, having been seized beyond the 12-mile limit, was brought by the Mascoutin into Charleston harbor and the vessel has been appraised at $12,000, and her cargo at $73,089, and the vessel and cargo have been seized by the marshal, and are now in the possession of the marshal under the process of this court.

[3] The first question of law arises upon the claimant's motion to dismiss, on the ground that the seizure was unlawful. There are cases which hold that, when it appears that the res is in possession of the officer making the seizure and within the jurisdiction of the court when the libel is filed, it is sufficient to support the jurisdiction, and that the seizure need not have been lawful in its origin, in so far as the jurisdiction of the court is concerned. Dodge v. U. S., 272 U. S. 530, 532, 47 S. Ct. 191, 71 L. Ed. ——; The Richmond v. U. S., 9 Cranch, 102, 3 L. Ed. 670; The Merino, 9 Wheat. 391, 403, 6 L. Ed. 118; The Caledonian, 4 Wheat. 100, 4 L. Ed. 523; Wood v. U. S., 16 Pet. 342, 359, 10 L. Ed. 987; Taylor v. U. S., 3 How. 197, 11 L. Ed. 559; The Underwriter (C. C. A. 2d) 13 F. (2d) 433, 434.

But it is exceedingly doubtful whether these decisions apply to the case of a foreign vessel seized upon the high seas. No decision has been called to the attention of the court which holds that this principle is applicable to the present case, and the court is not aware of any such decision. Without deciding that question, I shall assume for the purposes of this case that the principle is not applicable, and shall proceed to consider and decide the question of the lawfulness of the original seizure of the Vinces.

The government cited in support of its contention the case of The Ship North v. The King, 37 Can. Sup. Ct. 385, 3 Ann. Cas. 806. That case holds that, where a foreign vessel comes within the 3-mile limit and pursuit is commenced within that limit, this pursuit may be continued and the vessel seized beyond the 3-mile limit. The 3-mile limit, however, is generally conceded to be within the territorial jurisdiction, and that case, therefore, is not strictly applicable, for here the question concerns the 12-mile limit, as to which different considerations may prevail. The principle involved in that decision, however, does tend to support the contention of the government.

In the Mariana Flora, 11 Wheat. 1, 41, 6 L. Ed. 405, cited by the government, it was

said that American ships offending within our jurisdiction may be pursued and seized upon the ocean, and rightfully brought into our ports for adjudication. But these remarks were applied to American ships.

In the recent case of Maul v. U. S., 47 S. Ct. 735, 71 L. Ed. —— (decided May 31, 1927), the Supreme Court held that American vessels might be seized beyond the 12-mile limit, but in that case the court said that there were distinctions in respect of seizing foreign vessels on the high seas, and that those distinctions were not involved in that case. The case of The Rosalie M. (D. C.) 4 F.(2d) 815, cited by the government, was a case of the seizure of an American vessel. It is true that in that case the court said that the right extends as fully, as far as the authority goes, to foreign ships as to those of our own registry, subject only to diplomatic considerations. But this observation was merely dictum. It is valuable, however, as an expression of the learned judge who delivered the opinion.

It must be conceded that there is no case which decides the precise point in issue here. The decisions cited by the government tend to support its theory, but they are not directly in point. Since the question is a novel one, it will be necessary to recur to certain fundamental principles and endeavor to reason from them to a proper solution of the problem.

[4] It is now settled in the United States, and recognized elsewhere, that the territory subject to its jurisdiction includes the land areas under its dominion and control, the ports, harbors, bays, and other inclosed arms of the sea along the coast, and a marginal belt of the sea extending from the coast line outward a marine league, or 3 geographical miles. Cunard S. S. Co. v. Mellon, 262 U. S. 100, 122, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306; Church v. Hubbart, 2 Cranch, 187, 234, 2 L. Ed. 249.

[5, 6] The high seas, however, are the common property of all nations. The authority of a nation within its own territory is, of course, absolute and exclusive. The authority of a nation over the high seas is not exclusive, but must be exercised with due regard to the rights of other nations therein. Every nation has the inherent right to protect itself and to provide for the enforcement of its laws and the security of its territorial jurisdiction. For the purpose of self-protection and the due execution of its laws, and for the prevention of frauds on its revenue, it may exercise an authority on the high seas beyond the 3-mile limit. Church v. Hubbart, 2 Cranch, 187, 2 L. Ed. 249; Hudson v.

Guestier, 6 Cranch, 281, 3 L. Ed. 224; Manchester v. Massachusetts, 139 U. S. 240, 258, 11 S. Ct. 559, 35 L. Ed. 159; The Apollon, 9 Wheat. 361, 370, 6 L. Ed. 111; U. S. v. Bowman, 260 U. S. 94, 99, 43 S. Ct. 39, 67 L. Ed. 149; The Richmond v. United States, 9 Cranch, 102, 3 L. Ed. 670.

It follows from these principles that Congress has the right, in order to provide for the due execution of the laws of the United States and to prevent frauds upon the revenue, to exercise extraterritorial jurisdiction on the high seas; that is, beyond the 3-mile limit. It is true that the exercise of this power may bring the United States into collision with foreign nations. That, however, is not a matter for the courts. The exercise of this right, and in what cases and to what extent it shall be exercised, are matters addressed to the law-making and executive branches of the government, and not to the judicial. When Congress has acted, and prescribed limits for searches and seizures on the high seas, it is the duty of the courts to give effect thereto.

In order to prevent frauds upon the revenue, Congress has provided for visitation, search, and seizure on the high seas within 12 miles of the coast. The statutes now in force are revisions of earlier enactments, which in turn were largely influenced by the so-called British Hovering Acts of the eighteenth century. See 9 George II, c. 35, §§ 22 and 23, and 24 George III, c. 47, § 1. The 12-mile limit for the visitation and inspection of ships bound for the United States was first adopted by Congress in the Act of August 4, 1790, §§ 13 and 14 (1 Stat. 145, 157, 158), and has been re-enacted and revised from time to time, and uniformly recognized and applied by the courts. The present act applicable to this case is contained in Tariff Act 1922, § 581 (42 Stats. 979 [Comp. St. § 5841h]), and is as follows:

"Sec. 581. *Boarding Vessels.*—Officers of the customs or of the Coast Guard, and agents or other persons authorized by the Secretary of the Treasury, or appointed for that purpose in writing by a collector may at any time go on board of any vessel or vehicle at any place in the United States or within four leagues of the coast of the United States, without as well as within their respective districts, to examine the manifest and to inspect, search, and examine the vessel or vehicle, and every part thereof, and any person, trunk, or package on board, and to this end to hail and stop such vessel or vehicle, if under way, and use all necessary force to compel compliance, and if it shall

appear that any breach or violation of the laws of the United States has been committed, whereby or in consequence of which such vessel or vehicle, or the merchandise, or any part thereof, on board of or imported by such vessel or vehicle is liable to forfeiture, it shall be the duty of such officer to make seizure of the same, and to arrest, or, in case of escape or attempted escape, to pursue and arrest any person engaged in such breach or violation.

"Officers of the Department of Commerce and other persons authorized by such department may go on board of any vessel at any place in the United States or within four leagues of the coast of the United States and hail, stop, and board such vessels in the enforcement of the navigation laws and arrest, or, in case of escape or attempted escape, pursue and arrest any person engaged in the breach or violation of the navigation laws."

Under the provisions of this section, it is clear that the officers of the Mascoutin had undoubted authority to hail the Vinces and stop and arrest her, if necessary, while she was within the 12-mile limit, and this is practically conceded. But in this case the Vinces was hailed within the 12-mile limit and pursued and captured beyond it, and the precise question is whether such a seizure is lawful. Bearing in mind the fundamental principles upon which the right to exercise extraterritorial jurisdiction is based, I am convinced that, under the facts of this case, the seizure was lawful. It is the duty of every foreign vessel bound for the United States, coming within the 12-mile limit, to submit to search and seizure by the lawful authorities of the United States. If this right may be defeated simply by escaping beyond the limit, then the object to be attained would in many cases be absolutely frustrated.

We are not concerned here with any question of an entire escape, or the case of reaching the territorial waters of the home nation of the vessel pursued, or of some other nation; for here there was a continuous hot pursuit and a capture on the high seas. The act itself provides that, in case of an escape or an attempted escape, the government officers may pursue and arrest any person engaged in any breach or violation of any laws of the United States. Could it have been the purpose of Congress to confine the pursuit to the 12-mile limit? Certainly the act does not in terms thus limit the right of pursuit. The act gives the right to board, search, and seize, and this carries with it the right of such pursuit as is necessary to effect those objects, and the vessel escaping or attempting to escape cannot by such act defeat those rights.

[7] The counsel for the claimant contends, however, that the treaty between the United States and Great Britain for the prevention of smuggling of intoxicating liquors, proclaimed May 22, 1924 (43 Stat. 1761), has abrogated the statute providing for the boarding of vessels within four leagues of the coast, so far as intoxicating liquors on board British ships are concerned, and that the treaty is exclusive, and that the rights of the parties are to be ascertained exclusively under that treaty. He further asserts that under the treaty the search and seizure here made were unlawful, first, because, although the vessel may have come within an hour's sailing distance of the coast, yet the seizure was made more than an hour's sailing distance therefrom, and is therefore unlawful; and, secondly, that the treaty limits the right for the purpose of ascertaining whether those on board are endeavoring to import or have imported alcoholic beverages into the United State in violation of law. The pertinent provisions of this treaty are contained in article 2 and are as follows:

"Article II.

"(1) His Britannic Majesty agrees that he will raise no objection to the boarding of private vessels under the British flag outside the limits of territorial waters by the authorities of the United States, its territories or possessions, in order that inquiries may be addressed to those on board and an examination be made of the ship's papers for the purpose of ascertaining whether the vessel or those on board are endeavoring to import or have imported alcoholic beverages into the United States, its territories or possessions, in violation of the laws there in force. When such inquiries and examination show a reasonable ground for suspicion, a search of the vessel may be instituted.

"(2) If there is reasonable cause for belief that the vessel has committed or is committing or attempting to commit an offense against the laws of the United States, its territories or possessions, prohibiting the importation of alcoholic beverages, the vessel may be seized and taken into a port of the United States, its territories or possessions, for adjudication in accordance with such laws.

"(3) The rights conferred by this article shall not be exercised at a greater distance from the coast of the United States, its territories or possessions, than can be traversed in one hour by the vessel suspected of endeavor-

ing to commit the offense. In cases, however, in which the liquor is intended to be conveyed to the United States, its territories or possessions, by a vessel other than the one boarded and searched, it shall be the speed of such other vessel and not the speed of the vessel boarded, which shall determine the distance from the coast at which the right under this article can be exercised."

In support of his contention that the treaty is exclusive, counsel cites certain decisions which state that the treaty was intended by the two nations to deal with and did deal with the matter in a complete way. See The Pictonian (D. C.) 3 F.(2d) 145; The Frances Louise (D. C.) 1 F.(2d) 1004; The Sagatind (D. C.) 4 F.(2d) 930; The Sagatind (D. C.) 8 F.(2d) 789.

But in none of these cases was the point considered or made that the treaty had the effect of abrogating pro tanto the statute providing for search and seizure within the 12 mile-limit. If the contention of counsel is correct, then the effect of the treaty in a large number of cases would be to restrict the rights of the United States; but that was not the object of the treaty. As was said by the Supreme Court in the case of Ford v. U. S., 47 S. Ct. 531, 71 L. Ed. ——, decided April 11, 1927, the parties were dealing with a situation well understood by both, and wished to enable the United States better to police its seaboard by enabling it within an hour's sail from its coast beyond its territorial jurisdiction and on the high seas to seize British actual or would-be smugglers of liquor.

The court also said that the treaty indicates a considerate purpose on the part of Great Britain to discourage her merchant ships from taking part in the illicit importation of liquor into the United States, and the further purpose of securing without objection or seizure the transportation on her vessels through the waters and in the ports of the United States of sealed sea stores and sealed cargoes of liquor for delivery at other destinations beyond the United States, and that the counter consideration moving to the United States is the *enlargement* (italics mine) and the definite fixing of the zone of legitimate seizure of British hovering vessels seeking to defeat the laws against importation of liquor into this country from the sea. The court also said that, considering the friendly purposes of both countries in making the treaty, it should not be given a narrow construction which would defeat it. Ford v. U. S., supra.

There is not a syllable in the treaty itself which indicates any intention to restrict or abrogate any of the existing rights of the Unit-

ed States in reference to the subject-matter. At the time the treaty was executed, and for a long time anterior thereto, the United States had exercised the right of search and seizure within the 12-mile limit. Similar rights, as we have seen, had been exercised by the British government from the early part of the eighteenth century. It is inconceivable that the parties could have intended to abrogate any such rights already existing without an explicit statement to that effect. I am clearly of opinion that the British treaty is not exclusive, and did not abrogate the statute of the United States providing for search and seizure within the 12-mile limit.

But, even if it be assumed that the British treaty is exclusive, nevertheless, under the terms of that treaty, I still think the seizure was lawful.

The first point made by counsel for the claimant is that the treaty states that the rights conferred "shall not be exercised at a greater distance from the coast of the United States, its territories or possessions, than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense." He practically concedes that, as far as the 12-mile limit is concerned, if a vessel comes within that limit, under the law of necessity she may be pursued beyond that limit and there captured; but he says that this principle is not applicable under the British treaty, because the treaty itself says that the rights conferred shall not be exercised at a greater distance from the coast than one hour's sailing.

A strict and literal interpretation of the treaty might lead to this conclusion, but I cannot think that the contracting parties had such result in mind. Every argument based on necessity, and the right of the United States to pursue beyond the 12-mile limit and seize there, is applicable with equal force to the rights to be exercised under the British treaty. If a vessel can come within one hour's sailing distance, and evade the rights conferred by the treaty by escaping beyond that distance, then the treaty is in great measure nullified. Indeed, the learned counsel practically concedes that such would be the case. I apprehend that a vessel under British registry is bound by her laws and by the treaties of that country, and when such a vessel comes within an hour's sailing distance, and the officers of the United States have probable cause, as prescribed by the treaty, then it is the duty of the British vessel, when properly hailed, to stop and submit to examination. If she does not so stop, the United States has the right to compel her to stop, and in pursuance of this undoubted right may pursue her and enforce

it, even though the offending vessel escape beyond one hour's sailing distance of the coast.

The second point made in this respect by counsel for the claimant is that the treaty applies only to the case where a vessel or those on board are endeavoring to import or have imported alcoholic beverages into the United States. It is of course conceded that it is unlawful, under the Eighteenth Amendment to the Constitution and the National Prohibition Act and the Tariff Act of 1922, to import intoxicating liquors into the United States. National Prohibition Act, tit. 2, § 3 (Comp. St. § 10138½aa); Tariff Act of 1922, § 593 (42 Stats. 982 [Comp. St. §§ 5841h12, 5841h13]). His argument is that in this case the Vinces never came within the United States or within the 3-mile limit, and that there is no proof that any alcoholic beverages were actually landed or brought into the territorial jurisdiction of the United States. But the treaty is not so confined. It applies when the vessel or those on board are endeavoring to import. It also applies when there is reasonable cause for belief that the vessel is committing or attempting to commit an offense against the United States. Conceding that no alcoholic beverages in the case at bar were actually brought into the territorial jurisdiction of the United States—that is, within the 3-mile limit—nevertheless, it is clear that the Vinces not only was endeavoring to import such liquor into the United States, but she was attempting to commit an offense against the laws of the United States.

The counsel argues that there was merely an intention on the part of the Vinces to offend against those laws. It is true that there was an intention, but the facts show something more. The Vinces came within the 12-mile limit; came within an hour's sailing distance. She was headed directly for the shore; her intention was to land this liquor, either herself or by means of smaller vessels meeting her, and if those acts, in connection with all the circumstances of the case, do not show that she was endeavoring to import, and also that she was attempting to commit an offense against the laws of the United States, then I am at a loss to know how it could be shown that she was endeavoring to import or attempting to commit an offense without showing the actual importation or the commission of the offense itself, and certainly the treaty contemplates acts falling short of an actual importation and the final consummation of the intended offense.

Coming now to the merits of the case, we will consider first the first cause of action,

which is based upon the failure of the master to produce a manifest for the cargo. The provisions of the Tariff Act of 1922 which are relied upon to sustain this cause of action are as follows:

"Sec. 431. *Form of Manifest.*—The master of every vessel arriving in the United States and required to make entry shall have on board his vessel a manifest in a form to be prescribed by the Secretary of the Treasury and signed by such master under oath as to the truth of the statements therein contained. Such manifest shall contain:

"First. The names of the ports at which the merchandise was taken on board and the ports of entry of the United States for which the same is destined, particularly describing the merchandise destined to each such port: Provided, that the master of any vessel laden exclusively with coal, sugar, salt, nitrates, hides, dyewoods, wool, or other merchandise in bulk consigned to one owner and arriving at a port for orders, may destine such cargo 'for orders,' and within fifteen days thereafter, but before the unlading of any part of the cargo such manifest may be amended by the master by designating the port or ports of discharge of such cargo, and in the event of failure to amend the manifest within the time permitted such cargo must be discharged at the port at which the vessel arrived and entered.

"Second. The name, description, and build of the vessel, the true measure or tonnage thereof, the port to which such vessel belongs, and the name of the master of such vessel.

"Third. A detailed account of all merchandise on board such vessel, with the marks and numbers of each package, and the number and description of the packages according to their usual name or denomination, such as barrel, keg, hogshead, case, or bag.

"Fourth. The names of the persons to whom such packages are respectively consigned in accordance with the bills of lading issued therefor, except that when such merchandise is consigned to order the manifest shall so state.

"Fifth. The names of the several passengers aboard the vessel, stating whether cabin or steerage passengers, with their baggage, specifying the number and description of the pieces of baggage belonging to each, and a list of all baggage not accompanied by passengers.

"Sixth. An account of the sea stores and ship's stores on board of the vessel."

Comp. St. § 5841e.

"Sec. 583. *Certification of Manifest.*—The master of every vessel and the person in charge of every vehicle bound to a port or

place in the United States shall deliver to the officer of the customs or Coast Guard who shall first demand it of him the original and one copy of the manifest of such vessel or vehicle, and such officer shall certify on the back of the original manifest to the inspection thereof and return the same to the master or other person in charge."

Comp. St. § 5841h2.

"Sec. 584. *Falsity or Lack of Manifest.*— Any master of any vessel and any person in charge of any vehicle bound to the United States who does not produce the manifest to the officer demanding the same shall be liable to a penalty of $500, and if any merchandise, including sea stores, is found on board of or after unlading from such vessel or vehicle which is not included or described in said manifest or does not agree therewith, the master of such vessel or the person in charge of such vehicle shall be liable to a penalty equal to the value of the merchandise so found or unladen, and any such merchandise belonging or consigned to the master or other officer or to any of the crew of such vessel, or to the owner or person in charge of such vehicle, shall be subject to forfeiture, and if any merchandise described in such manifest is not found on board the vessel or vehicle the master or other person in charge shall be subject to a penalty of $500: Provided, * * *"

Comp. St. § 5841h3.

"Sec. 594. *Seizure of Vessels and Vehicles.*—Whenever a vessel or vehicle, or the owner or master, conductor, driver, or other person in charge thereof, has become subject to a penalty for violation of the customs revenue laws of the United States, such vessel or vehicle shall be held for the payment of such penalty and may be seized and proceeded against summarily by libel to recover the same: Provided, * * *"

Comp. St. § 5841h14.

The Supreme Court has decided that the fact that the merchandise on board of a vessel cannot be lawfully imported does not dispense with the necessity of a manifest for such merchandise. One of the purposes of requiring a manifest is to enable the officers to detect and prevent the importation of forbidden merchandise. U. S. v. Sischo, 262 U. S. 165, 43 S. Ct. 511, 67 L. Ed. 925.

[8] In the consideration of these statutes it must be borne in mind that it is now settled law that the United States statutes to prevent frauds upon the revenue are considered as enacted for the public good and to suppress a public wrong, and therefore, although they may impose penalties or forfeitures, are not to be construed, like penal laws generally,

strictly in favor of the defendant; but they are to be fairly and reasonably construed, so as to carry out the intention of the Legislature. U. S. v. Stowell, 133 U. S. 1, 12, 10 S. Ct. 244, 33 L. Ed. 555; U. S. v. A. Graf Distillery Co., 208 U. S. 198, 205, 206, 28 S. Ct. 264, 52 L. Ed. 452; U. S. v. Hodson, 10 Wall. 395, 19 L. Ed. 937; Cliquot's Champagne, 3 Wall. 114, 145, 18 L. Ed. 116; Taylor v. U. S., 3 How. 197, 210, 11 L. Ed. 559.

[9] The first question to be decided is whether the clearance paper produced by the master and claimed by him to be a manifest is such a paper as complies with the requirements of these sections. It is to be observed that section 584 provides a penalty for not producing "the manifest." The manifest thus required is evidently the manifest defined in section 431. It is too plain for argument that this clearance certificate was not such a manifest as is required by the statute. It was not in the form prescribed by the Secretary of the Treasury, was not signed by the master under oath, contained none of the information prescribed by section 431, and, even if it covered the cargo then on board (which it did not), there is no detailed account of the merchandise as required by paragraph 3 of section 431.

[10] The next question is whether the penalties may be inflicted for the failure to produce the manifest, where the manifest was not demanded until the vessel was beyond the 12-mile limit. In other words, where a vessel is observed within the 12-mile limit, and refuses to stop and there submit to a demand for the manifest, but escapes beyond the 12-mile limit, and is there seized and the manifest demanded, can the penalties be inflicted for such failure as if the demand was made within the 12-mile limit?

Those revenue provisions which are made expressly operative within the 12-mile limit are to be viewed as an assertion of extraterritorial jurisdiction, justified by the necessities of territorial security. It is upon this principle, as we have already shown, that the United States has established the 12-mile limit. A foreign vessel bound for our ports, coming within that limit, must be deemed to have submitted herself to this provision. When hailed within the 12-mile limit, it is the duty of such vessel to halt and submit to the visitation and the demand for the manifest. This is a right which the United States has asserted, and which is not in conflict with international law, and which has been recognized and acquiesced in by Great Britain and other nations. When this right once attaches, it cannot be defeated by any act of such foreign vessel in attempting to escape, provided the United

States officials pursue and arrest upon the high seas. The right having once attached within the 12-mile limit, when the vessel is seized beyond that limit and the demand there made for the manifest, such demand is to be deemed as constructively made within the 12-mile limit, and, if there is a failure to produce at that time, the penalties of law may be imposed. Such a construction of the revenue statutes in question is a fair and reasonable one, and one that necessarily follows from the original basis of such statutes, namely, the law of necessity for the protection of the nation and the enforcement of its laws.

[11] The next point that the counsel for the claimant makes is that no manifest is required until the vessel actually arrives within the territorial waters of the United States, and that, as the Vinces never arrived within the United States, the master was not bound to produce any manifest. He bases this argument on the language of section 431, which defines a manifest. That section says that "the master of every vessel arriving in the United States and required to make entry shall have on board his vessel a manifest in a form," etc. But there is no inconsistency between the provisions of section 431 and the requirements of sections 581 and 584. Section 581 authorizes the government officials within the 12-mile limit to board and examine the manifest; and section 584 provides that the person in charge of any vehicle bound to the United States, who does not produce the manifest shall be liable, etc.

When properly construed, these provisions simply mean that every vessel bound for the United States, upon arriving at the 12-mile limit, must be prepared to produce the manifest if demanded. The vessel may or may not be boarded and the manifest demanded before she actually arrives in the United States. If she is so boarded and such demand made, sections 581 and 584 apply. If she is not so boarded, and the demand there made, and she actually arrives in the United States, then under the provisions of section 431 she must have on board a manifest. The statutes must not only have a fair and reasonable construction under the cases already cited, but they must be construed so as to give effect to all parts, as far as possible. If the contention of the counsel is correct, that no manifest is required until she actually arrives in the United States, then the provisions of sections 581 and 584 have no effect. Section 581, which gives the right to board within 12 miles and inspect the manifest, would be absolutely meaningless, if no manifest was required until the vessel arrives within the territory of the United States.

[12] The claimant's counsel also contends that in any event the only penalty that can be imposed for the failure to produce the manifest is the penalty of $500. His position is that the penalty to be imposed for the value of the merchandise and the penalty of the forfeiture of the merchandise itself are to be applied only in the case of merchandise not included in an existing manifest, and that, where no manifest at all is produced, no penalty can be imposed for the value of the merchandise nor can the cargo be forfeited. But I think this construction of the act is too narrow. The act provides that there must be produced a manifest. It also provides that, if any merchandise is found on board which is not included in said manifest or does not agree therewith, there shall be assessed a penalty equal to the value of such merchandise and the merchandise itself is declared to be the subject of forfeiture, where such merchandise belongs to the master or the owner of the vessel. It would be a strange situation if, in the case of a failure to include merchandise in the manifest, heavier penalties could be imposed than in the case where there is no manifest at all.

If the construction contended for by the claimant is true, then a master might have on board a large amount of merchandise intended to be smuggled into the United States, not included in the manifest, and when boarded could destroy or refuse to produce the manifest, and escape with a light penalty of $500, when, if he had produced the manifest, the value of the omitted merchandise might far have exceeded that sum. For example, let us suppose that a master of a vessel has a manifest, but the manifest does not cover a large portion of the cargo, which he intends to smuggle, and which is valued say at $10,000. Under the claimant's construction of the act, in such case, if the master produces his manifest, he would be liable for a penalty of $10,000 and the merchandise would also be forfeited, if it belonged to him or to the owner, or to any of the other persons mentioned in the statute; while, on the other hand, if he destroys the manifest or fails to produce it, he would escape with a small penalty of $500. He would thus have it absolutely within his power to fix his own penalty at the lesser sum.

A construction that leads to such results is not to be adopted, in the absence of a clear intent of Congress to that effect. The section in terms says that there must be a manifest,

and that any property not included in the manifest is subject to forfeiture, and subjects the master and vessel also to a penalty equal to the value thereof. In the present case, the property in question was certainly not included in any manifest. While the statute is not drawn as clearly as it might be, nevertheless it is capable of the construction contended for by the government, which is a fair and reasonable one, and the case clearly comes within the spirit of the act.

The only case that has been called to my attention upon this point is a decision by the District Court for the District of Rhode Island. In that case there was no manifest, and the court held that the master became liable to a penalty of $500, and also to a penalty equal to the value of the merchandise found on board, not described in the manifest. The cargo which consisted of liquor was also forfeited, but the forfeiture of the cargo was apparently based upon the ground that it had been unlawfully brought into and transported within the territory of the United States. The Pesaquid (D. C.) 11 F.(2d) 308, 311, 312.

Inasmuch as the master of the Vinces produced the clearance certificate in question and exhibited it as a manifest, and inasmuch as the cargo then on board was not included in that paper, it might plausibly be contended that the master is bound by his action in that respect and that the cargo can therefore be forfeited, because not included in that paper. This would relieve the master of the penalty of $500, but would not relieve him from the penalty of the value of the cargo or the forfeiture thereof. It does not seem that the master should be allowed to produce a paper as a manifest, and then claim to be relieved from penalties and forfeitures, because it does not in all respects conform to the statute. There is to my mind considerable force in this contention, but I prefer to base my decision as to the penalty for the value of the cargo and its forfeiture on the construction of the act that I have above adopted.

[13] I hold, therefore, that the master in this 'case became liable for a penalty of $500, and an additional penalty to the extent of the value of the cargo, to wit, $73,089, and under the provisions of section 594, quoted above, these penalties may be recovered by seizure and sale of the vessel.

[14] I hold also that the cargo itself is subject to forfeiture, as it belonged to the owner of the vessel.

[15] The second cause of action is based on section 592 of the Tariff Act of 1922 (Comp. St. § 5841h11), and claims a forfeiture of the cargo by reason of the false statements made by the master. Section 592 provides that "if any consignor * * * or other person * * * enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever * * * without reasonable cause to believe the truth of such statement * * * such merchandise * * * shall be subject to forfeiture. * * * The arrival within the territorial limits of the United States of any merchandise consigned for sale and remaining the property of the shipper or consignor, and the acceptance of a false or fraudulent invoice thereof by the consignee or the agent of the consignor or the existence of any other facts constituting an attempted fraud shall be deemed, for the purposes of this paragraph, to be an attempt to enter such merchandise notwithstanding no actual entry has been made or offered.

It is to be observed that this statute applies to the case where a person enters or attempts to enter "imported merchandise." The Supreme Court has held that importation consists in bringing an article into a country from the outside. Cunard S. S. Co. v. Mellon, 262 U. S. 100, 122, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306.

[16] It is clear, therefore, that this statute cannot apply unless the merchandise actually arrives within the territorial jurisdiction of the United States. That this is the proper construction is evidenced further by the last part of the section, which states that the "arrival within the territorial limits of the United States" of certain merchandise shall be deemed an attempt to enter. I am satisfied that this statute is confined to those cases in which the merchandise actually arrives within the territorial limits of the United States. In the case at bar the cargo never came within the 3-mile limit, and therefore cannot be said to have been imported.

Moreover, the false statements of the master were not made in an effort to enter or introduce the cargo into the commerce of the United States. At the time the statements were made, he was endeavoring to escape, and the false statements were made, not for the purpose of enabling him to bring the merchandise in, but rather to escape with it altogether. For these reasons, I cannot sustain the forfeiture of the cargo under the second cause of action.

[17] The third cause of action charges the master with fraudulently and knowingly im-

porting and bringing into the United States the cargo, etc., and is based on section 593 of the Tariff Act of 1922. Inasmuch as the cargo was never imported or brought into the territorial jurisdiction of the United States, it is clear that the forfeiture of the cargo cannot be sustained under this section, and at the hearing the government very properly abandoned the third cause of action.

For these reasons I think the United States is entitled to a decree for a penalty of $500, and a further penalty of $73,089, the value of the cargo, and a sale of the vessel and the application of the proceeds in satisfaction of these penalties. I also think that the United States is entitled to a decree for a forfeiture of the cargo.

Let the proctor for the libelant prepare a final decree in accordance with this opinion, serve a copy thereof upon the proctor for the claimant, and submit the same, upon four days' notice, to the court for signature.