### THE NEWTON BAY.

Circuit Court of Appeals, Second Circuit.
December 2, 1929.

No. 37.

Louis Halle, of New York City (David V. Cahill, of New York City, of counsel), for appellants.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Herbert H. Kellogg, Asst. U. S. Atty., of Brooklyn, N. Y., of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge. The Newton Bay, of British registry, by the decree appealed from, was ordered sold for the payment of penalties which were imposed upon the master for violation of section 584 of the Tariff Act of 1922 (19 USCA § 486).

On December 2, 1927, she was sighted 8½ miles off the shore of Fire Island, in the Atlantic Ocean, by the United States Coast Guards on the cutter Gresham. This position was fixed by bearings and cross-bearings taken by the navigator of the cutter. The Newton Bay appeared to be at anchor when sighted by the officers of the Gresham. She was displaying anchor lights and headed south to. southeast. When sighted, she changed her position to south. The Gresham proceeded to head her off, but she sailed on in an erratic course, with her lights out, and the Gresham could' not tell what course she was navigating. She was later picked up by the searchlight of the Gresham, and seemed to be going southwest, and, as stated by the Coast Guard officer, "it was hard to keep track of the Newton Bay, because she was steering an erratic course in trying to dodge us apparently in the dark." After 44 minutes of pursuit, the Gresham fired two blank shots, and the Newton Bay came to a stop, beyond 13 miles of the shore. The Coast Guard officers boarded her and found the hatch on the after deck was not sealed. A cargo of 4,113 packages of liquors, valued at $51,000, was on board, and also some rotten fish in the lower hold. She was a steam trawler, 170 feet long, 30 feet wide, 15 feet deep, and of about 635 gross tonnage. Her master had no manifest aboard, but the papers produced, pursuant to a demand therefor, consisted of an agreement with the crew, certificate of British registry, a bridge book, and log book. The master said there were no other papers. These facts, testified to by the Coast Guard officers, remained uncontradicted, for no witnesses were called by the appellant.

If the captain of the vessel intended lawfully to land the cargo in the United States, he was required to have a manifest in the form prescribed by the Secretary of the Treasury, signed by the master, a statement, under oath, containing the names of the ports at which the merchandise was taken on board, and the port of entry in the United States

for which it was destined, and describing the merchandise. The statute makes obligatory other requirements, which are not important here. If the intention was to land the liquor in the United States, and there was no manifest, the master violated section 584 of the act (19 USCA § 486). The Mistinguette (C. C. A.) 27 F.(2d) 738; The Squanto (C. C. A.) 13 F.(2d) 548; U. S. v. Bengochea (C. C. A.) 279 F. 537.

At the outset, the appellant maintains that the libel fails to state that the vessel was bound for the United States, and that it does not allege that the cargo either belonged to or was consigned to the master or some other officer of the vessel. This claim was not made below, nor is it the subject of any of the assignments of errors. It is now too late to ask us to consider the failure of such allegations, if such there be, in the libel. Pendleton Bros. Inc., v. Pearce (C. C. A.) 10 F.(2d) 692; The Blakeley (C. C. A.) 285 F. 348. However, we think this libel of forfeiture is sufficient as a pleading under the statute. Feitler v. United States (C. C. A.) 34 F.(2d) 30; Avignone v. United States (C. C. A.) 12 F. (2d) 509.

Upon the merits, a cause of forfeiture is fully established. As the ship's papers read, the destination of the vessel was to Tampico, Mexico, and she sailed from St. Pierre, Miquelon. Her ostensible course would take her about 250 to 350 miles off the coast of Long Island. There is no explanation why she was within 8½ miles of shore when sighted. Displaying her anchor lights near the coast gave every indication to infer that she intended to unload her cargo surreptitiously in smaller boats, which would carry it unlawfully to shore. Her flight, when sighted, and her course of navigation without lights, all confirm the intended unlawful entry of the merchandise.

But the argument is advanced that, because of what is written in Gillam v. United States (C. C. A.) 27 F.(2d) 296, as to the hot pursuit doctrine, this vessel may not be forfeited as the decree directs. As we have pointed out, the Newton Bay was bound for the United States within the meaning of section 584 of the Tariff Act of 1922 (19 USCA § 486). The Mistinguette, supra; Arch v. United States (C. C. A.) 13 F.(2d) 382; The Henry L. Marshall (D. C.) 286 F. 260, affirmed (C. C. A.) 292 F. 486, 488; U. S. v. Bengochea (C. C. A.) 279 F. 537. Therefore authority for the Coast Guard officers to board this vessel, found within four leagues of the coast, and to search and examine it, or any part thereof, and to use all necessary force to compel compliance, is found in section 581 of the Tariff Act of 1922 (19 USCA § 481). It provides:

"It shall be the duty of such officer to make seizure of the same, and to arrest, or, in case of escape or attempted escape, to pursue and arrest any person engaged in such breach or violation."

But if the claim of the appellant prevails, that, because the vessel outdistanced the Gresham while she was in pursuit, and was able to sail beyond the 12-mile limit before capture or before a signal to stop was given, she is beyond the reach of the statute, the purposes of the statute would be frustrated, and, indeed, this section of the Tariff Act would be nullified. It would work a mockery of the law. The Gresham did not hail the Newton Bay before she succeeded in getting outside the 12-mile limit for the very good reason that she was unable always to see or apprehend her while she was dodging in the darkness. As a practical matter, it would be useless to signal by a blast or horn, or by firing shots, when the vessel was attempting to escape. It is only after the Newton Bay was being overtaken, and saw the evident futility of her effort to escape, that hailing was of any avail and the command to stop was obeyed. The Gillam Case (C. C. A.) 27 F.(2d) 296, 299, like other authoritative decisions, must be reviewed from the facts there disclosed. The court there said:

"No point is made that the vessel was actually overhauled and the seizure actually made beyond the hour's sailing distance and beyond the 12-mile limit, if she was within these limits when signaled; and we think it is clear, under the 'hot pursuit' doctrine, that if the right of seizure existed at the time the vessel was signaled, the right was not lost because she had succeeded in getting farther from shore in her attempt to run away."

We do not regard this reference to the so-called "hot pursuit" doctrine as holding that a definite signal must be given to the vessel to stop within the 12-mile limit. The consideration of the case in the District Court [The Vinces, 20 F.(2d) 164], which won affirmance in the Circuit Court of Appeals, pointed out as a fact that the signal to stop was given within the 12-mile limit, and that it then became the duty of the vessel to stop, and, even though she, a foreign vessel, attempted to escape and succeeded in sailing without the 12-mile limit before capture, the right which attached within the 12-mile limit justified the demand for the manifest and its examination.

732

It was pointed out that the revenue provisions were made expressly operative within the 12-mile limit, and were to be viewed as an assertion of extraterritorial jurisdiction, justified by the necessities of territorial security. There is as sufficient a reason justifying the right to board and demand the manifest for the purpose of examination under the circumstances in the case at bar as justified that occasion in the Gillam Case. The action of the Newton Bay in attempting to escape and avoid capture by the Coast Guard is clear enough evidence that the master and the crew of the Newton Bay knew that the officers of the United States were after them for the purpose of enforcing the laws of the United States, since she had come to anchor within the 12-mile limit with a forbidden cargo. The Gillam Case dealt with a situation where the demand to stop was made within the 12 miles, while here the demand for permission to board the vessel and examine the documents took another form, in the pursuit by the Gresham while the Newton Bay was within the 12-mile limit, and the inference is fairly deducible that the crew of the latter knew of that pursuit and its object.

The courts have adhered to such construction of the revenue laws as will most effectually accomplish the intention of Congress in passing them. United States v. A. Graf Distillery Co., 208 U. S. 198, 28 S. Ct. 264, 52 L. Ed. 452; United States v. Hodson, 10 Wall. 395, 19 L. Ed. 937; Taylor v. United States, 3 How. 197, 11 L. Ed. 559. The Canadian Supreme Court, in Ship North v. The King, 37 Can. Sup. Ct. 385, gave recognition to the doctrine that when a vessel within foreign territory commits an infraction of its laws, either for the protection of its fisheries or its revenues or coasts, she may be immediately pursued into the open seas beyond the territorial limits and there taken. This verdict and seizure will not be frustrated by the wrongdoers who by chance just succeed in getting beyond the 12-mile limit.

The argument that the finding below that the Newton Bay had no manifest was contrary to the fact is without merit. A manifest is a summary of all the bills of lading. The papers which were exhibited did not answer the requirements which a master has the burden of assuming when he is about to make or should have made entry of his vessel and cargo into the United States. The manifest is for the protection of the ship and the owners of the cargo, and it is the duty of the master to take it on board and carefully preserve it. New York & Cuba Mail S. S. Co. v. United States (D. C.) 125 F. 320; 2 Parsons on Shipping, 973. The fact that the cargo could not be lawfully imported does not dispense with the necessity of a manifest for such merchandise. United States v. Sischo, 262 U. S. 165, 43 S. Ct. 511, 67 L. Ed. 925. The failure to show a consignee of the cargo justified the finding that it was consigned to or belonged to the master or members of the crew. The Squanto (C. C. A.) 13 F.(2d) 548; The J. Duffy (C. C. A.) 18 F.(2d) 754; United States v. 416 Cases G. T. Whisky (C. C. A.) 27 F.(2d) 738.

The findings of the court below are justified, and the conclusions reached will not be disturbed. Pendleton Bros., Inc., v. Morgan (C. C. A.) 11 F.(2d) 67; Johnston v. Compagne Navigazione (C. C. A.) 288 F. 847; The City of Baltimore (C. C. A.) 282 F. 490.

Decree affirmed.