## THE METMUZEL.

District Court, E. D. Virginia.

July 31, 1930.

Samuel E. Forwood, of Norfolk, Va. (Louis Halle, of New York City, and Ralph H. Daughton, of Norfolk, Va., on the brief), for claimant.

H. H. Rumble, Sp. Asst. to Atty. Gen. (Paul W. Kear, U. S. Atty., of Norfolk, Va., on the brief), for the United States.

GRONER, District Judge.

The United States filed their libel against the oil screw Metmuzel and a cargo of 1,103 bags of bottled whisky, alleging violation of sections 585, 584, and 594 of the Tariff Act of 1922 (19 USCA §§ 486, 487, 498). One William Miller, residing in St. Pierre, Miquelon, duly appeared and filed a claim to the said vessel and an answer denying the allegations of the libel, and specially that there was any violation on the part of the said vessel of the laws of the United States, and praying a dismissal of the libel.

The evidence was heard in open court today and shows substantially as follows: About 10 o'clock p. m. of June 1, 1930, the Metmuzel was discovered by officers of the Coast Guard vessel C. G. 200 near Parramore Bank Gas Buoy, without lights, and approximately six miles from the shore line of the Virginia coast of the United States. The Coast Guard vessel sounded her Klaxon and started in pursuit, whereupon the Metmuzel increased her speed and changed her course, heading to the right and toward the open sea. The chase continued only about ten or fifteen minutes and terminated when the Coast Guard vessel fired a shot. The Metmuzel was boarded, and her master, at the demand of the boarding officer, produced a paper showing that she had cleared from St. Pierre, Miquelon, on May 19, 1930, that her destination was "the high seas," and that her cargo consisted of "one lot of general merchandise and sea stores," without any record of consignor or consignee. The Metmuzel was seized and brought into port and delivered into the custody of the Collector of Customs of the Fourteenth Collection District at Norfolk, Va. Her cargo of liquor was appraised at $39,725 and a penalty of $500 assessed against the vessel for failure to produce her

manifest when demanded by the customs officers, and a further penalty of $39,725, the value of her cargo, for failure to manifest the same. In addition to these penalties, the government is asking the forfeiture of the vessel for violation of the act of Congress requiring a vessel, within the limits of a collection district, not to attempt to depart therefrom without making a report or entry under the provisions of the United States laws. Tariff Act of 1922, § 585 (19 USCA § 487).

Except the claim of ownership of the vessel and cargo, there was no evidence received during the trial on behalf of the claimant. The evidence on behalf of the government shows the facts above outlined and, in addition, a statement made by the master of the Metmuzel to one of the customs officers that his purpose and intention at the time of the seizure was to cruise off Parramore Gas Buoy until met by a vessel which would identify herself by calling the name "Miller" and into which he would unload his cargo. He added in the event he failed to make contact with this vessel at the agreed rendezvous he was to go to sea and cruise around until contact was established.

The question which I have to determine is whether, under these facts, the penalties were properly assessed, and, if they were, whether in addition forfeiture of the vessel should be decreed.

There is no doubt that the manifest produced by the master, which a careful search showed was the only manifest aboard the Metmuzel, did not comply with the laws of the United States (see U. S. Code, title 19, § 241 [19 USCA § 241]), but unless the Metmuzel was bound to the United States this law has no relevancy. Obviously if she intended to discharge her cargo within the United States, she was bound to the United States, and the first question is whether the evidence discloses sufficient facts upon which to determine that her real purpose was to discharge her cargo of contraband in the United States.

The paper which was produced on the demand of the Coast Guard officer showed she was bound for the high seas. The evidence discloses that at the time of her seizure she was within four marine leagues of the United States and that Parramore Gas Buoy, at which point her master admitted it was his purpose to form contact with another vessel for the purpose of discharging his cargo into the latter, was located between six and seven miles off the coast of the United States.

It is no longer open to debate that a vessel intending to discharge her cargo within the territorial waters of the United States is bound to the United States. It has likewise been held that a vessel intending to discharge into contact boats within four leagues of the coast, without herself entering territorial waters, is bound to the United States, and in the comparatively recent case of The Marion Phillis, 36 F.(2d) 688, 689, decided by the Circuit Court of Appeals, Second Circuit, December, 1929, it was held that the phrase "bound to the United States" should be interpreted to describe a vessel whose cargo was destined for transfer to smugglers outside the twelve mile limit. It seems to me therefore perfectly clear that following this line of authorities, the question propounded in this case must be determined against the Metmuzel and it would simply be to shut one's eyes to the obvious to argue or suggest that there was any other purpose from the time of the commencement of her voyage to the time of her seizure than the landing of her cargo, either directly or indirectly, on the shores of this country. This results from all the facts and circumstances surrounding her voyage and her location at the time of seizure and, of course, the character of cargo which she was carrying, but it results also from the statement of her master that it was, in fact, his intention to discharge his cargo into a vessel which, obviously, was to come out from the United States for that purpose and return to the United States with the contraband.

In this view of the case it follows that the penalties were properly assessed. There was no consignee of the cargo or, at least, nothing to show who the consignee was. The paper surrendered by the master of the Metmuzel is certainly not susceptible of interpretation as a denial of the full control by the master of the cargo. The ship was at sea, the master was in control, and though doubtless he may have been himself controlled by private orders or instructions, yet physically he had the absolute dominion of the vessel and the cargo and was not bound by any papers, which the law required him to have aboard, to exercise any other control than his own will with relation to the disposition of the cargo. The burden of proof of showing differently was on the claimant. That burden has not been met.

This whole subject may be found dis-

cussed at length in the case of Gillam v. U. S., from this circuit, reported in 27 F. (2d) 296.

The enforcement of the penalties will therefore be decreed, as well as the forfeiture of the cargo, both because the same was not properly manifested and because consigned to the master.

■ This leaves only for consideration the question of the forfeiture of the vessel. This is claimed under section 585 of the Tariff Act of 1922 (U. S. Code, title 19, § 487 [19 USCA § 487]), which provides that if any vessel from a foreign port arrives within the limits of any collection district and departs or attempts to depart except from stress of weather, etc., without making report or entry, the vessel shall be subject to forfeiture. It has been decided that this section has no applicability to the case of a vessel accidentally coming into the territorial waters of the United States, within a collection district, or to the case of a vessel which takes refuge at a port of the United States, but those exceptions are not involved in this case, for, as I have already shown, the Metmuzel was bound to the United States and intended that her cargo should be landed on our shore, but since admittedly she was seized outside the three-mile limit and within the twelve-mile limit, the question is whether or not her intention, plus her then location, is sufficient to bring her within the collection district. The executive order establishing the Fourteenth collection district describes the ports of entry included within that designation. It makes no attempt to embrace the waters of the sea or to define any limit with relation thereto. Undoubtedly the United States has complete dominion and sovereignty over the waters within three miles of the coast line and it has certain other jurisdiction for a distance of twelve miles. This jurisdiction has been recognized to include the enforcement by the United States of their revenue and customs laws. For that purpose therefore a vessel within twelve miles of the coast is as amenable to the revenue and customs laws as within three miles. It would be absurd, it seems to me, to say that a vessel intending to smuggle contraband merchandise into the United States could lay outside the three-mile limit and discharge her contraband in small boats and avoid the penalties in such cases prescribed against smuggling. In the present case the Metmuzel was outside the three-mile limit but within the twelve-mile limit, for the purpose of landing her cargo in the United States. For that reason I have held the enforcement of the penalties against her valid.

May she also be said to have arrived within the limits of the collection district? The question is new but it seems to me to answer itself. If the authority of the customs collection district extends outside the three miles for the purpose of enforcing the laws, it extends equally far for the purpose of determining the arrival of a vessel within its jurisdiction. This, it seems to me, is the effect of the decision of the Circuit Court of Appeals in The Javirena, 67 F. 154. In that case a Spanish fishing vessel was seized within five miles of the Florida mainland, partly loaded with fish and with wine. There was no charge of smuggling or attempting to smuggle, nor was it charged that she had communicated with shore. Her master testified he had anchored for the purpose of repairing her rigging. In dismissing the libel, the court there held that the purpose with which she arrived was the guiding principle, that is to say, that if her purpose was either accidental or lawful, the statute was not offended but that, if it were otherwise, it was, and that the jurisdiction concededly of the collection district extended beyond the three-mile limit and within the twelve-mile limit. And so in U. S. v. Bengochea, 279 F. 537, 541, it was held by the same Circuit Court of Appeals, referring to The Javirena, that because of the failure to show anything unlawful on the part of that vessel the statute did not apply and, for that reason alone, she was held "not liable to the penalty for departing from the collection district without making a report or entry."

The conclusion I reach is that any vessel bound for the United States and coming within twelve miles of the coast line of the United States is required to obey its laws and is amenable to those laws within those limits, that the territorial jurisdiction of the customs collection district extends as far as the laws are applicable, that is to say, within four marine leagues, and that a vessel located within that area has arrived within a collection district, and unless she is able to show that either stress of weather or some other exception contained in the statute exempts her from its provisions, the statute makes it her duty to comply with all of its provisions.

■ The Metmuzel was within six miles of the coast. Her purpose, as I have shown,

was to land her cargo unlawfully into the United States, and, in contemplation of law, she had arrived within the collection district, and was therefore prohibited from departing therefrom without making a report or entry. At the time of her overhauling she was unquestionably seeking to escape. It cannot be doubted, therefore, that she was leaving without reporting, and thus was violating section 487.

A decree may therefore be entered for the penalties assessed for the forfeiture of the cargo and likewise for the forfeiture of the vessel.

It is regretted that on account of the necessity of the disposition of the ship and cargo and therefore of an immediate decision of the case, it is impracticable to discuss this matter at greater length and likewise makes necessary a hurried preparation of my views.