## THE METMUZEL.

## MILLER v. UNITED STATES.

### No. 3119.

Circuit Court of Appeals, Fourth Circuit.
April 13, 1931.

Samuel E. Forwood, of Norfolk, Va. (Louis Halle, of New York City, and Ralph H. Daughton, of Norfolk, Va., on the brief), for appellant.

H. H. Rumble, Sp. Asst. to Atty. Gen. (Paul W. Kear, U. S. Atty., of Norfolk, Va., on the brief), for the United States.

Before PARKER and NORTHCOTT, Circuit Judges, and GLENN, District Judge.

PARKER, Circuit Judge.

This is an appeal from a decree of the court below [49 F.(2d) 365] assessing penalties of $500 and $39,725, the value of unmanifested cargo, against the master of the French oil screw Metmuzel under section 584 of the Tariff Act of 1922 (19 USCA § 486), condemning the vessel under section 594 (19 USCA § 498) for the payment of the penalties so assessed, and decreeing her forfeiture under section 585 (19 USCA § 487). The decree was entered upon a libel of information filed by the United States, after the vessel had been seized and brought into port by officers of the Coast Guard. The libel charged violation of the provisions of the Tariff Act which require vessels bound

for the United States to have a manifest of cargo, to produce and deliver same to the officers of the Coast Guard upon demand, and not to depart or attempt to depart from any collection district without making entry. One William Miller intervened and filed answer claiming the vessel and cargo; and from the decree below he has appealed to this court.

The facts may be briefly stated. About 10 o'clock in the evening of June 1, 1930, the Metmuzel was discovered by a vessel of the Coast Guard near Paramore Bank Gas Buoy, and within six miles of the shore of the United States, running without lights and headed for the shore. The Coast Guard vessel hailed her, whereupon she turned about and put out to sea. A chase followed, which was ended by the vessel of the Coast Guard firing upon her. She then hove to and officers boarded her and demanded production of her manifest. Her master produced no manifest but a clearance certificate, called "manifest of clearance" issued at St. Pierre, Miquelon, showing that she had cleared that port on May 19th, that her cargo consisted of a lot of merchandise and sea stores, and that her destination was the high seas. The officers found upon search that her cargo, subsequently appraised by the customs appraisers at $39,725, consisted of 1,103 bags of whisky and 8 bottles of miscellaneous liquors. The master stated that his instructions were that a vessel would come out and meet him at Paramore Bank and receive from him the cargo of liquor, and that, failing to make contact there, he was to draw off shore about sixty-five miles and wait until he should succeed in making contact with the vessel. The seizure took place six and one-half miles off shore, and the seized vessel was brought into the port of Norfolk where the Collector of Customs assessed against her master penalties of $500 for failure to produce a manifest and $39,725 for having on board unmanifested cargo.

The District Judge found that the Metmuzel was bound to the United States and was within four leagues of the shore at the time of the seizure; that her master failed to produce a manifest on demand and that the cargo was not manifested; that the cargo had a value of $39,725 and was consigned to the master; and that the vessel had arrived from a foreign port or place within the limits of the Fourteenth collection district of the United States and had attempted to depart therefrom without making a report or entry, there being no stress of weather or other necessity for such departure. He held

that the vessel was liable for the penalties assessed, decreed that vessel and cargo be forfeited to the United States, and directed that the vessel be delivered to the Coast Guard for use in the enforcement of the customs laws, as provided by the Act of March 3, 1925 (43 Stat. 1116).

Under the principles decided by us in Gillam v. United States (C. C. A. 4th) 27 F.(2d) 296, 299, there can be no question as to the propriety of the seizure of the vessel, the assessment of the penalties and their enforcement as liens against her, nor as to the forfeiture of the cargo. That case discusses fully all the questions which arise with regard to these matters, and we need not repeat what we said there. A vessel is unquestionably bound for the United States, within the meaning of section 584 of the Tariff Act 1922, where she intends to discharge her cargo within the territorial waters of the United States. The Mistinguette (C. C. A. 2d) 27 F.(2d) 738; U. S. v. 63 Kegs of Malt (C. C. A. 2d) 27 F.(2d) 741; The Newton Bay (C. C. A. 2d) 36 F.(2d) 729. And she is to be deemed bound for the United States, within the meaning of the section, if her cargo is destined for delivery to smugglers in this country, even though it is to be transferred to another vessel beyond the twelve mile limit. The Marion Phillis (C. C. A. 2d) 36 F.(2d) 688. The clearance certificate produced by the master was clearly not a manifest of cargo within the meaning of the statute. U. S. v. Sischo, 262 U. S. 165, 167, 43 S. Ct. 511, 67 L. Ed. 925; The Squanto (C. C. A. 2d) 13 F.(2d) 548; U. S. v. 63 Kegs of Malt, supra; The Newton Bay, supra. As the vessel was bound for the United States and had entered the twelve-mile limit of the revenue statutes with an unmanifested cargo and failed to produce a manifest on demand, she was liable for the penalties prescribed by section 584 of the Tariff Act 1922 and to seizure under section 581 (19 USCA § 481) for having incurred such penalties.

Complaint is made as to the amount of the penalty assessed on account of the unmanifested cargo; but, in addition to the presumption of correctness attaching to the appraisal, there was convincing evidence that same was correct and nothing to the contrary.

The principal point raised by the appeal is that the forfeiture of the vessel under section 585 of the Tariff Act (19 USCA § 487) was not justified, the argument being that she never arrived within a collection district of the United States and was, therefore, not subject to forfeiture under that

section. The statute in question is as follows: *"Departure of vessel or unlading of merchandise before making report or entry; penalty.* If any vessel or vehicle from a foreign port or place arrives within the limits of any collection district and departs or attempts to depart, except from stress of weather or other necessity, without making a report or entry under the provisions of this chapter, or if any merchandise is unladen therefrom before such report or entry, the master of such vessel shall be liable to a penalty of $5,000, and the person in charge of such vehicle shall be liable to a penalty of $500, and any such vessel or vehicle shall be subject to forfeiture, and any customs or Coast Guard officer may cause such vessel or vehicle to be arrested and brought back to the most convenient port of the United States."

■ The question here is whether the Metmuzel had arrived within the limits of a collection district at the time she was hailed by the Coast Guard; for it is unquestioned that she attempted to depart without making a report or entry as required by the statute. The question may be still further narrowed to an inquiry as to whether the place where she was hailed off Paramore Bank and within about six miles of the shore was within a collection district; for, as she had come there with the intention of transferring her cargo for delivery in the United States, she had "arrived" within the meaning of the statute. Harrison v. Vose, 9 How. 372, 380, 13 L. Ed. 179; The Cherie (D. C.) 9 F.(2d) 640; Id. (C. C. A. 1st) 13 F.(2d) 992.

The executive order defining the Fourteenth or Virginia collection district is as follows: "(14) The District of Virginia to include all of the State of Virginia, except the county of Alexandria, with District headquarters at Norfolk, in which Norfolk and Newport News, Richmond, Petersburg, Cape Charles City, Chincoteague and Readville shall be ports of entry. The Port of Norfolk shall include both of said cities and the waters and shores of Hampton Roads."

■ Appellant contends that the collection district thus defined is limited to the territorial boundaries of the United States, which extend only to the three-mile limit at sea. We think, however, that this ignores the jurisdiction asserted under the revenue statutes to the twelve-mile limit, and that the collection district as contemplated by the statute in question extends to that limit. Neither the statute nor the executive order attempts to define the limits at sea of the collection district; and, in the absence of such definition, it seems clear that the district must be held to embrace the territory within which the customs officials are given jurisdiction and required to perform their duties. How far does this territory extend?

Section 581 of the Tariff Act 1922 (19 USCA § 481) authorizes officers of the Customs or of the Coast Guard to board any vessel within four leagues of the coast of the United States *"without as well as within their respective districts,"* to examine its manifest and to inspect, search or examine the vessel itself. It will be noted that the language quoted expressly recognizes the four league limit as being within the collection district. Section 586 (19 USCA § 488) provides for penalties against the master and for seizure and forfeiture of vessel and merchandise for permitting merchandise to be unladen from the vessel without a permit, where it has arrived within four leagues of the coast of the United States. And it will be noted that this statute recognizes practically the same exception as is recognized by the statute providing forfeiture for departure without entry after arriving in a collection district, viz., "accident, stress of weather, or other necessity." When we construe these sections together, as we must do, since they are parts of the same act, it is clear that, for preventing frauds on the revenue, customs officials are authorized to exercise jurisdiction over the ocean embraced within the twelve-mile limit and that such territory must, therefore, be deemed within their respective collection districts within the meaning of the statute.

There can be no question as to the validity of statutes authorizing customs officials to exercise their jurisdiction to the twelve mile limit and thus making the zone within such limit a part of the collection districts within which they are to operate. As we said in Gillam v. United States, supra: "Such provisions have been a part of every tariff act passed by Congress beginning with the statute of 1790 (1 Stat. 145) which introduced the 4-league limit (section 31) of the British hovering statutes. While in effect an assertion of extraterritorial jurisdiction, they are justified on the ground that they are necessary to territorial security and the proper enforcement of the laws of the country. Church v. Hubbart, 2 Cranch, 187, 235, 236, 2 L. Ed. 249; The Apollon, 9 Wheat. 362, 371, 6 L. Ed. 111; Manchester v. Mass., 139 U. S. 240, 258, 11 S. Ct. 559, 35 L. Ed. 159; The Cherie (C. C. A. 1st) 13 F.(2d) 992; Arch v. U. S. [(C. C. A.) 13 F.(2d)

382], supra; Dickinson on Jurisdiction at the Maritime Frontier, supra."

It is argued that a vessel which has not been within the jurisdiction of the United States cannot be guilty of a crime or incur a forfeiture under the laws of the United States. This begs the question. For the purpose of enforcing the revenue laws, the United States asserts jurisdiction to the twelve-mile limit; and a vessel bound for the United States which comes within that limit is within the jurisdiction asserted and maintained for the enforcement of those laws, and is subject to the penalties which they prescribe. If a ship bound for the United States may be required to produce a manifest of its cargo as soon as it comes within the twelve-mile limit or may be forfeited for transferring cargo within such limit without a permit, there is no reason why forfeiture should not be enforced against a vessel bound for the United States which departs without making an entry as the statute requires.

In Arch v. U. S. (C. C. A. 5th) 13 F.(2d) 382, 384, the Circuit Court of Appeals of the Fifth Circuit dealt with a case in which a rum-laden vessel anchored outside the three mile but within the twelve-mile limit. In affirming a decree imposing penalties under section 581 of the Tariff Act 1922, the court laid down what we think was the correct rule, and one which we think equally applicable to a forfeiture under section 585. Said the court, speaking through Judge Foster: "Conceding that the criminal laws of the United States such as the National Prohibition Act are not effective more than three miles from the shore, nevertheless, from the earliest times, the United States has claimed and exercised jurisdiction over the marginal sea to at least four leagues for the purpose of enforcing her revenue and customs laws. Jurisdiction was so assumed by the Act of March 2, 1799 (1 Stat. 646, § 25), and continued to the present day by the various tariff and customs administrative acts. Great Britain also claimed the same extent of territory by the Hovering Act of 1736, 9 George 2d, C. A. P. 35, and doubtless, every maritime nation claims the same right. The Supreme Court has recognized the right of a nation to enforce her customs and navigation laws on the high seas beyond the three-mile limit. Church v. Hubbart, 2 Cranch, 187, 2 L. Ed. 249. And we have so held in United States v. Bengochea, 279 F. 537, a case in all its essential features similar to this one. It is evident that the Island Home was loaded with a cargo intended to be introduced into the United States by those on board. This could be done by the use of small boats after arriving within a convenient distance from the coast as well as by sailing into a harbor and there unloading on lighters or at a wharf. When she reached a point within four leagues of the shore she was as much within the jurisdiction of the United States as if actually in port, and was required to observe all the customs laws and regulations."

The cases upon which appellant relies are not in point. In the Apollon, 9 Wheat. 362, 6 L. Ed. 111, the vessel sought to be forfeited had merely sailed up the St. Mary's river, which formed the boundary between the territory of the United States and Spain, and anchored in Spanish waters. She did not enter the river for the purpose of going into an American port, and did not anchor in the river except upon the Spanish side. The court held that there was no arrival within American territory requiring report and entry, but a mere transit to a point in Spanish territory through waters over which Spain had equal authority with the United States. In The Javirena (C. C. A. 5th) 67 F. 152, while the vessel anchored within twelve miles of the coast, she did so for the purpose of repairing a disabled mast, and not for the purpose of trade or business. She was not bound for any port of the United States, and there was nothing to show that she was engaged in violation of the revenue laws. It was held that she was not required to make entry; and, while the holding is manifestly correct, it can have no application to the case at bar, where the vessel in question was bound for the United States for the purpose of violating its revenue laws. In The Over the Top (D. C.) 5 F.(2d) 838, the acts complained of occurred nineteen miles at sea, and the court intimated that, had they occurred within the twelve-mile limit, the libels might have been sustained. Burns v. U. S. (C. C. A. 5th) 296 F. 468, was a prosecution for conspiracy to violate the National Prohibition Act; and the holding was that the mere fact that a vessel passed at a certain place within the three-mile limit did not authorize officers to board her where there was no showing that she was bound for a port or place within the United States. It has no bearing upon the question as to whether a vessel bound for the United States must make entry after passing within the twelve-mile limit before departing from the collection district.

For the reasons stated, we think that the decree below was correct, and same will accordingly be affirmed.

Affirmed.