## THE MAZEL TOV.
### No. 1646.

District Court, D. Rhode Island.
May 16, 1931.

Henry M. Boss, Jr., U. S. Atty., of Providence, R. I. (Charles H. Eden, Asst. U. S. Atty., of Providence, R. I., on the brief), for the United States.

Joseph E. Fitzpatrick, of Providence, R. I., for claimant.

LETTS, District Judge.

This is a libel in rem brought by the United States against the British motor vessel Mazel Tov, after it had been seized and brought into port by officers of the Coast Guard, to effect the collection of certain penalties claimed to have been assessed against the master for alleged violations of the Tariff Act of 1930. The libel states three causes for penalty: (1) Failure to produce the manifest of the cargo, (2) having on board merchandise not described in the manifest, and (3) having arrived within the limits of Collection District No. 4 and attempting to depart without making entry. The first two causes are laid as violations of section 584 (19 USCA § 1584), and the third as a violation of section 585 (19 USCA § 1585). No forfeiture of either cargo or vessel is asked.

I shall not here review the testimony of the various witnesses, but will state the facts as I find them to be. On the evening of November 1, 1930, the Mazel Tov was boarded

by officers of the United States destroyer Tucker off the coast of Massachusetts eleven and one-half miles from the nearest point of land. The vessel at the time was under way, but promptly stopped when signaled so to do. Her sole cargo, outside of sea stores, consisted of four hundred three sacks of whisky which had been cleared at St. Pierre on October 16. While the cargo was little more than one-fourth the quantity which the vessel could carry, there was no evidence that the Mazel Tov had either been in communication with our shores or had unladen any part of her cargo. The circumstances compel the conclusion that the vessel was cruising about off our coast with the intent on the part of the master that ultimately the cargo would be taken to the United States by other boats. The evidence indicates that the master of the Mazel Tov did not intend to approach nearer than four leagues to our coast. The point of land from which the Mazel Tov is here found to have been eleven and one-half miles distant is a small island, "No Man's Land," lying some distance at sea off the island of Martha's Vineyard.

The speed of the Mazel Tov, under normal conditions, was not in excess of ten knots. Her certificate of registration gives the speed as nine knots, which is not inconsistent with the size of the vessel and motors with which it is equipped. The master testified the boat could do between nine and ten knots. No evidence was presented by the government which would suggest that these speeds were not substantially correct.

Upon request of the boarding officer, the Mazel Tov's papers were produced, consisting of her certificate of British registry, manifest, clearance papers, and crew list. The manifest, which was written in French, shows the port of departure to have been St. Pierre and gives the destination of the vessel as "Nassau et la haute mer." The cargo and consignee appear as follows:

"1 lot de diverses marchandises lest et provisions de bord.

"Saint Pierre le 16 Octobre 1930.
　　　　　　　"Le·capitaine:
　　　　　　　　　"F. D. Cook."

Following the inspection by the boarding crew, the Mazel Tov was taken in tow by the Coast Guard at a point thirteen miles from land, having drifted a considerable distance during the period of inspection. She was brought to the port of Providence and there turned over to the customs officials, together with her cargo. The cargo was appraised by customs officials and the following notification to the master given:

　　　　　　　　"November 18, 1930.
"Frank Cook,
　"Master of British Motorship Mazel Tov,
　"c/o Joseph E. Fitzpatrick, Attorney,
　"317 Hospital Trust Bldg.,
　"Providence, R. I.
"Sir:

"You are hereby notified that the above-named vessel has become liable to penalties for violations of Acts of Congress as follows:

"Tariff Act of 1930, Sec. 584, Falsity of Manifest, $14,286.18.

"Tariff Act of 1930, Sec. 584, Lack of Manifest, $500.

"Tariff Act of 1930, Sec. 585, Attempting to Depart Before Report or Entry, $5,-000.

"These violations occurred November 1, 1930, at, to wit, 6:05 p. m. in latitude 41° 68'[1] 45" N and longitude 70° 36' 30" W, within a collection district of the United States, said vessel having thereafter been arrested by Customs and Coast Guard officers and brought to the Port of Providence.
　"Respectfully,
　　　　"Emery J. San Souci, Collector."

No other action was taken by the government prior to filing this libel.

At the outset there is one question which underlies all three causes stated in the libel. The Mazel Tov, loaded with liquor ultimately intended for transshipment to the United States, was seized at a point less than four leagues from our coast, but at a greater distance than she could have traversed in one hour. Was this seizure lawful? The answer to this question is dependent upon the relation to, and effect upon, the search and seizure provisions of the Tariff Act, of the Treaty entered into between the United States and Great Britain, proclaimed May 22, 1924 (43 Stat. 1761).

The preamble of the treaty·recites that the two nations "being desirous of avoiding any difficulties which might arise between them in connection with the laws in force in the United States on the subject of alcoholic beverages, have decided to conclude a Convention," etc. The preamble also recites that the purpose of the convention is "to aid in the prevention of the smuggling of intoxicating liquors into the United States."

---

[1] Error in notice.

Article 1 asserts the intention of the parties "to uphold the principle that 3 marine miles * * * constitute the proper limits of territorial waters." Paragraph (1) of article 2 provides for boarding and examining vessels of British registry. Paragraph (3) of article 2 provides: "The rights conferred by this article shall not be exercised at a greater distance from the coast of the United States its territories or possessions than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense." The remaining provisions of the treaty are not here necessary to be stated.

It was clearly indicated by the court in the case of Ford et al. v. United States, 273 U. S. 593, 47 S. Ct. 531, 71 L. Ed. 793, in an opinion written by Mr. Chief Justice Taft, that this treaty had relation to all the laws in effect in the United States having to do with prohibiting and forestalling the importation of intoxicating liquor. In that case the court said at page 618 of 273 U. S., 47 S. Ct. 531, 539: "The parties were dealing with a situation well understood by both. In effect they wished to enable the United States better to police its seaboard, by enabling it *within an hour's sail* from its coast, beyond its territorial jurisdiction, and on the high seas, to seize British actual or would-be smugglers of liquor and, if they were caught, to proceed criminally against them as if seized within the 3-mile limit for the same offenses in reference to liquor importation. No particular laws by title or date were referred to in the treaty, but only the purpose and effect of them." The court referred specifically to both the National Prohibition and tariff legislation, and on page 619 of 273 U. S., 47 S. Ct. 531, 540 says: "Any law, the enforcement of and punishment under which will specifically prevent smuggling of liquor, should be regarded as embraced by the treaty."

There appears to be entertained three distinct interpretations of the effect of this treaty.

First. That the treaty extends the right of search and seizure so that a vessel with a speed greater than twelve knots can be seized within the distance of one hour's sail even though that be more than four leagues from our coast. Those entertaining this view, when confronted with the query upon what legislative authority can a vessel be seized beyond four leagues from our coast, which is the maximum distance fixed in any provision of the Tariff Act (there being no right of pursuit involved), resort to the doctrine that "the treaties are self-executing and extend the laws of the United States." [2] They entirely ignore the fact that the treaty purports to forbid nothing but only indicates that "His Britannic Majesty agrees that he will raise no objection to the boarding of private vessels," etc., and that if certain conditions exist "the vessel may be seized and taken into a port of the United States, * * * for adjudication in accordance with such laws," clearly referring to acts of Congress.

Second. Others seem to recognize that there is nothing in the treaty which extends the application of any act of Congress but are unwilling to accept the conclusion that the effect of the treaty may in many instances, where the vessel involved could not traverse in one hour a distance of four leagues, result in limiting the exercise of the right of search and seizure asserted by Congress. As was said by the court in the case of the Vinces (D. C.) 20 F.(2d) 164, at page 174: "It is inconceivable that the parties could have intended to abrogate any such rights already existing without an explicit statement to that effect. I am clearly of opinion that the British treaty is not exclusive, and did not abrogate the statute of the United States providing for search and seizure within the 12-mile limit."

Those entertaining this view appear to assume that prior to the negotiation of the treaty there was an unquestioned right to search and seize within the limits fixed by the statute. Perhaps that was so from the point of view of domestic law. It clearly was not so from the point of view of our international relations with Great Britain and many other countries. The purpose of the treaty was to avoid and to set at rest any international complications arising from an assertion of extraterritorial jurisdiction by Congress which was not recognized by other nations. Both the United States and Great Britain had long been the champions of limiting general territorial jurisdiction to the three-mile limit and had left all assertions of authority beyond that limit, in instances where protecting or police measures were necessary, to be dealt with as specific problems, rather more administrative than jurisdictional in character.

[2] This notion may have been introduced by some courts because of the currency which has been given to an excerpt from a communication by Secretary Hughes, March 3, 1924, addressed to the House Committee on Foreign Affairs, in which he said: "The proposed treaty is, in a strict sense, self-executing, requiring no legislation on the part of Congress to make it effective."

■■ The third view as to the effect of this treaty, and the one which I believe is supported by the majority of present authorities and by the soundest reasoning, is that it dealt completely with the subject of the limits within which search and seizure of British vessels could be made in the enforcement and application of our laws for the prevention of the importation or smuggling of liquor, and that the treaty excludes all extra-territorial seizures (that is, beyond the three-mile limit) not made in conformity with the terms of the treaty. That such was the intention of the parties is apparent from the statement made by Secretary Hughes, who negotiated the treaty with the British government, in his note of July 19, 1923, to the British Embassy wherein he said:

"It may confidently be asserted that there would be no disposition on the part of the American authorities, and the special agreement would not justify any attempt, to seize a British vessel, save within the limits proposed, and when it was clear that the vessel concerned was directly involved in an attempt to introduce its illicit cargo into the territory of the United States." MS. records, Department of State.

■ It is a matter of common knowledge that prior to entering into the treaty agreement the British government had on several occasions protested against the seizure of boats of British registry outside the three-mile limit which carried cargoes of liquor. This situation existed at the time the treaty was negotiated and the convention entered into. The treaty says:

"The rights conferred by this article shall not be exercised at a greater distance from the coast of the United States * * * than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense."

Can it be seriously urged that after entering into this treaty there remained in all cases the same maximum authority which had before been asserted and which was the cause of the differences to be settled?

In one of the early cases dealing with this question, the Frances Louise (D. C.) 1 F. (2d) 1004, at page 1005, Morton, J., upon this point, said:

"I have great doubt whether any such broad right of seizure exists as the government contends. But it is not necessary to decide this question, because I am clearly of opinion that the whole situation is covered by the treaty. The circumstances surrounding the execution of that treaty are matters of general knowledge. Vessels of British registry were lying off our coasts, delivering liquor to small boats, which smuggled it ashore. Seizures of such vessels were made by our officials, which were regarded by the British government as unjustified by international law, and led to representations by the British government to this country. On the other hand, British ships found themselves much embarrassed by the decision of the Supreme Court in Cunard S. S. Co. v. Mellon, 262 U. S. 100, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306, concerning supplies of liquor which they customarily carried for use on board. Under these circumstances the treaty was negotiated. It dealt explicitly with the case of liquor ships hovering on our coast and being visited by small boats from shore. Of course, such small boats only come to the hovering vessel to get contraband goods. Both parties understood that. The plain inference is that such trading does not render the hovering vessel amenable to seizure as long as she keeps to the high seas, except as provided in the treaty. I think both nations intended the treaty to deal with the matter in a complete way. If so, upon familiar principles of law, it is conclusive."

In the case of the Sagatind (D. C.) 4 F. (2d) 928, at page 930, Hand, J., says, in referring to a similar treaty entered into between the United States and Norway:

"The foregoing treaty extends any limitation which might exist upon the jurisdiction of the court to proceed against offending vessels which may be subject to forfeiture for violations of our laws 'prohibiting the importation of alcoholic beverages' to such cases as may come within the terms of the treaty, and, I think, also implies as an alternative rule of treaty-made law that vessels shall not be proceeded against for violation of such laws when seizure was made beyond the distance from our coast prescribed in the treaty. In other words, the treaty completely deals with the extreme right of seizure upon which initial jurisdiction of the cause of forfeiture must depend."

■■ This construction as to the effect of the treaty obviously amounts to a limitation upon, and no extension of, the statutes affected. No statute dealing with this question asserts a jurisdiction or imposes any penalty beyond the distance of four leagues. The application of the treaty, therefore, in respect to all vessels of less than twelve knots, results in a qualification or limitation of the statute

involved by narrowing the zone over which it may be applied to that distance only which the vessel can traverse in one hour. It is, of course, an elementary principle that a treaty may have that effect upon an existing act of Congress. The rule as generally stated is that wherever there be an inconsistency between an act of Congress and a treaty, the one most recent in point of time must control. Ribas y Hijo v. United States, 194 U. S. 315, 24 S. Ct. 727, 48 L. Ed. 994; Rainey v. United States, 232 U. S. 310, 34 S. Ct. 429, 58 L. Ed. 617.

The only difficulty in applying this long-established doctrine in the present case, to the end of construing the treaty as a limitation upon the act of Congress, is that the treaty was negotiated in 1924 and the present action is brought under the Tariff Act of 1930. An examination, however, of the Tariff Act of 1930 (46 Stat. 590) discloses that the enforcement provisions thereof are substantially verbatim re-enactments of like sections in the Tariff Act of 1922 (42 Stat. 858). It cannot be assumed, therefore, that Congress had any intention of altering the status and effect of these treaties when it re-enacted in 1930 the enforcement provisions prevailing when the British and other treaties were entered into.

The conclusions here reached, in respect to the effect of the British treaty, compel the dismissal of the libel and discharge of the vessel. In the hope, however, that the case may be reviewed on appeal, I shall deal with the other and subordinate issues raised which in general affect separate causes stated in the libel. This will insure a final disposition of the case through having its full consideration before the court for review.

 The next issue to be considered is: What are the limits of a collection district? This issue arises under the third cause stated in the libel which alleges that the Mazel Tov arrived from a foreign port within the limits of Collection District No. 4 and attempted to depart without making entry in violation of section 585.

It is contended on behalf of the government that the limits of the collection district extend four leagues from the shore. If this contention be sound, the Mazel Tov was, at the time she was boarded, one-half mile within the limits of Collection District No. 4. If, however, as has been found, it was not the intention of her master to go within four leagues of the coast of the United States and that his doing so was an inadvertent approach too close to the small island mentioned, there may be grave doubt as to whether the boat, though within the twelve-mile limit, had "arrived" within the meaning of the term as used in section 585, and in this connection it will be recalled that the Mazel Tov when boarded had not been at anchor but was under way. Passing, however, the matter of the proper construction of the term "arrived" within the meaning of the act, I am satisfied that the Mazel Tov was not within the limits of the collection district as alleged.

The present organization of the customs service was fixed by executive act of the President pursuant to legislative authority as outlined in the President's Message to Congress under date of March 3, 1913, with only minor changes which, by similar action, have subsequently been made. Collection District No. 4, as then and now designated, is as follows:

"No. 4, Massachusetts, Ports of entry: Boston (including Cambridge, Chelsea, Medford, Everett, Quincy, and Somerville), Fall River, Gloucester, New Bedford, Plymouth, Provincetown, Salem (including Beverly, Marblehead, and Lynn), Springfield, Vineyard Haven, Worcester."

An examination of the legislation and executive action discloses a division of the territorial United States into some forty-nine customs-collection districts, together with their ports of entry and district headquarters. These districts are variously designated, some by states, some inclusive of two states, and some such as District No. 12, "Pittsburgh, Port of entry: Pittsburgh."

Nowhere in the legislation or executive acts organizing the customs service is there any suggestion of including within a district any area beyond the territorial limits of the state or other municipal designations. The state of Massachusetts is a very definite area, consisting of the land within its borders and littoral waters extending out three miles. Dunham v. Lamphere, 3 Gray (Mass.) 268.

Although the term "collection district" has for many years been used in our customs legislation, there are few cases which directly involve the definition of the term. They are all so recent as to be yet unreported at this writing. The Metmuzel Miller v. United States, 49 F.(2d) 368, 370 (C. C. A. Fourth Circuit) decided April 13, 1931; United States v. The Frances T (C. C. A. Second Circuit) 46 F.(2d) 1021; The Deauville (D. C. Southern District of Alabama) 49 F.(2d) 372, 374, decided April 29, 1931. All of these cases would be cited in support of the contention that the limits of a collec-

tion district extend beyond our territorial waters to four leagues from the coast.

In the case of The Frances T, the question of whether the vessel had arrived within the limits of a collection district was involved; the Circuit Court of Appeals, Second Circuit, affirming, without opinion, the holding of Coxe, J., that the vessel had entered collection district No. 11.[3] The vessel was seized about ten miles off shore. An examination of the record of the case discloses, however, that there was evidence, and upon appeal the government so contended, that the Frances T had been within the three-mile limit and made shore contact. There is nothing in the records of the District Court and/or Circuit Court to indicate whether these courts did or did not find that the vessel had been in territorial waters.

In the case of The Deauville, the court, in holding that the limits of a collection district extend beyond territorial waters, rested the decision solely upon the authority of The Metmuzel Case, supra. Judge Ervin's full discussion of the question is as follows:

"It is urged that being over three miles from shore, and nearly twelve miles, she was not within a collection district.

"This contention is met by Miller v. United States, 49 F.(2d) 368, Fourth Circuit, decided April 13, 1931."

The only considered opinions, therefore, to be found upon the question are those in The Metmuzel Case, that of Groner, J., for the Eastern District of Virginia, and that of Parker, C. J., affirming the lower court.

While I am reluctant, sitting as a court of first instance, to decline to follow the holding of a Circuit Court of Appeals, even of another circuit, I cannot in this case do so and believe that the error of the conclusions reached upon this question in the case of The Metmuzel can be demonstrated.

At the outset, in his consideration of the question in The Metmuzel, Parker, J., says:

"Appellant contends that the collection district thus defined is limited to the territorial boundaries of the United States, which extend only to the three-mile limit at sea. We think, however, that this ignores the jurisdiction asserted under the revenue statutes to the twelve-mile limit, and that the collection district *as contemplated by the statute in question* extends to that limit."

The court there appears to ignore the fact that nowhere in the statute in question is

there the slightest indication that Congress purports, by implication or otherwise, to be defining or fixing collection districts. The collection district had already, by totally disassociated legislation and executive action, been fixed and established. There is nothing to suggest that the Tariff Act of 1930, or that of 1922, undertook to alter the limits of these districts. It must be assumed that when Congress used the term in section 585 of the Tariff Act they were using it with the meaning and with the limits which had long since been-established. It is pure sophistry to try to read into the term "collection district" a meaning drawn by inference from the Tariff Act. If in 1913 in fixing the collection districts Congress had expressly asserted extra-territorial limits for those districts along our coast, it would be the duty of the courts to respect that assertion and leave the international complication for other authority to settle. But Congress did not do so, and it is not for the courts, in the absence of express language of Congress, to now enlarge upon the meaning of the term.

Parker, J., further says: " * * * it seems clear that the district must be held to embrace the territory within which the customs officials are given jurisdiction and required to perform their duties. How far does this territory extend?"

This observation by the court involves the assumption that Congress may not, in exercising certain police prerogatives over extra-territorial waters, assign duties to customs officials beyond the limits of their collection districts. There appears no good reason in law why such duties may not be charged upon customs officials as well as upon the Coast Guard. In fact, the very statute under consideration indicates that Congress had in mind charging customs officials with duties and prerogatives of exactly that character.

Section 581 of the Tariff Act 1930 (19 USCA § 1581), containing the general provisions authorizing the boarding of vessels, provides in part:

"Officers of the customs or of the Coast Guard, and agents or other persons authorized by the Secretary of the Treasury, or appointed for that purpose in writing by a collector may at any time go on board of any vessel or vehicle at any place in the United States or within four leagues of the coast of the United States, *without as well as within their respective districts*, to examine. * * * *"

See Maul v. United States, 274 U. S. 501, 47 S. Ct. 735, 71 L. Ed. 1171, and con-

---

[3] Memorandum only.

curring opinion of Brandeis and Holmes, JJ., at page 512 of 274 U. S., 47 S. Ct. 739.

The practice of nations to exercise certain protective measures beyond their territorial limits, to better protect their territory, has long been recognized by international law and comity among nations. That such assertions of authority are, however, extraterritorial,[4] although accepted and approved within limitations, does not alter the fact that they are predicated upon necessity and mutual international tolerance. Le Louis, 2 Dodson Adm. Rep. 210, 245. Nowhere is there legal warrant for courts to assert such a jurisdiction by implication. This is especially true of English and American courts.

At another part of his opinion Parker, J., says: "If a ship bound for the United States may be required to produce a manifest of its cargo as soon as it comes within the twelve-mile limit or may be forfeited for transferring cargo within such limit without a permit, *there is no reason why forfeiture should not be enforced against a vessel bound for the United States which departs without making an entry as the statute requires.*"

The court in The Metmuzel Case begs the question by assuming requirements of the statute as to entry and appears to overlook the fact that Congress in section 581, authorizing boarding and search, specifically fixes the distance within four leagues of the coast of the United States and in section 586 (19 USCA § 1586), forbidding unlading without permit, says: "After its arrival within four leagues," etc., but in section 585, dealing with departure without entry, for its application fixes the distance "within the limits of any collection district." If it was intended that the latter should mean the same distance as is expressly provided in the other sections, why was not the same simple statement "within four leagues" used?[5]

Having in mind the fact that we are here dealing with a statute penal in character, and

the rule that extraterritorial jurisdiction should not be asserted by a federal court in the absence of express congressional mandate, it is my opinion that every sound principle of construction requires the definition of the "limits of any collection district" as being the limits of territorial waters, namely, one league from our coast.

The next issue to be considered is that raised by the first cause stated in the libel. It is alleged that the master became subject to a penalty of $500 under section 584 for failure at the point where the vessel was boarded to produce the manifest of the cargo. This section, entitled "Falsity or lack of manifest," provides in part as follows:

"Any master of any vessel and any person in charge of any vehicle bound to the United States who does not produce the manifest to the officer demanding the same shall be liable to a penalty of $500, and if any merchandise, including sea stores, is found on board of or after having been unladen from such vessel or vehicle which is not included or described in said manifest or does not agree therewith, the master of such vessel or the person in charge of such vehicle or the owner of such vessel or vehicle shall be liable to a penalty equal to the value of the merchandise so found or unladen, and any such merchandise belonging or consigned to the master or other officer or to any of the crew of such vessel, or to the owner or person in charge of such vehicle, shall be subject to forfeiture, and if any merchandise described in such manifest is not found on board the vessel or vehicle the master or other person in charge or the owner of such vessel or vehicle shall be subject to a penalty of $500. * * * *"

In the present case, the government's own testimony discloses that upon request the ship's papers were promptly produced, including one purporting to be a manifest, the content of which has already been stated. The government contends, however, that the master is liable for a penalty of $500 for failure to "produce the manifest" on the ground that the manifest presented, being inadequate, amounted to no manifest at all.

The government relies upon the case of The Irene C (D. C.) 41 F.(2d) 288, 290. In that case the vessel was bound for the United States and was less than four leagues, but more than one league, from our coast. In regard to her manifest the court said: "As her manifest did not comply with the basic requirements of our law (19 USCA § 241), it is for present purposes a nullity. Phile v. The Anna, 1 Dall. 197, 1 L. Ed. 98." The

[4] "The Government of the United States has repeatedly asserted that the limits of territorial waters extend to three marine miles outward from the coastline. * * * It is quite apparent that this government is not in a position to maintain that its territorial waters extend beyond the three-mile limit and in order to avoid liability to other Governments, it is important that in the enforcement of the laws of the United States this limit should be appropriately recognized." Secretary Hughes' address before the Council on Foreign Relations, New York, January 23, 1924.

[5] "Yet in fact we do not deal differently with a statute from our way of dealing with a contract. We do not inquire what the legislation meant; we ask only what the statute means." Harvard Law Review, vol. 12, pp. 417, 419. "The Theory of Legal Interpretation"—Oliver Wendell Holmes.

citation is in point, but with its conclusion I do not agree.

The government's contention is based upon the fact that the manifest produced by the master of the Mazel Tov eleven and one-half miles from our coast did not conform to the requirements of title 4, § 431, of the act (19 USCA § 1431). This section provides in part as follows:

"The master of every vessel *arriving in the United States and required to make entry* shall have on board his vessel a manifest *in a form* to be prescribed by the Secretary of the Treasury and signed by such master under oath as to the truth of the statements therein contained."

To determine whether the requirements of section 431 as to form and content of a manifest are to be read into section 584, it becomes necessary to scrutinize the subdivisions of the statute and to consider the purpose and application of these subdivisions. Title 4 of the statute (19 USCA §§ 1401–1654), entitled "Administrative provisions," is in turn divided into parts 1, 2, 3, 4, 5, and 6. Each part is subdivided into numerous sections providing different and independent penalties where it is intended to penalize for their nonobservance. Section 431, wherein counsel for the government finds the detailed requirements for the form of a manifest, is the first section of part 2 which is entitled, "Report, Entry, and Unlading of Vessels and Vehicles." I am convinced from a reading of the several sections of part 2 (19 USCA § 1431 et seq.) that they apply only to vessels which have arrived in our territorial waters and in general come into intended application only when the vessel has arrived in port.

It is not until we come to part 5 (19 USCA § 1581 et seq.), wherein we find the several sections brought under consideration by the present libel, that we come to that portion of the act embodying the special enforcement provisions and which includes among its several sections those which assert and authorize the special extraterritorial jurisdiction which has already been discussed.

Indicative of what I may term the intended "port application" of the provisions of part 2 is the very nature of the things required to be done. For example, section 431, fixing the form of the manifest, makes it applicable to the master of every vessel arriving in the United States and required to make entry. Section 439 (19 USCA § 1439), closely following in part 2, provides:

"Immediately upon arrival and before entering his vessel, the master of a vessel from a foreign port or place required to make entry shall mail or deliver to the comptroller of customs for the district in which the port of entry is located, a copy of the manifest. * * * "

Surely no common sense interpretation of the meaning of the terms "arrival" and "arrived" as used in part 2, when considered in conjunction with things required to be done, could construe them as meaning the crossing of an extraterritorial line twelve miles at sea.

The purpose of the requirements and penalties of section 584, part 5, is to facilitate a protective and general examination of the vessel and cargo at any point within four leagues from our coast. It represents a part of the extraterritorial authority asserted. The section does not purport to impose a domestic control over the detail or form of the ship's papers other than that the cargo must be described, which is obviously necessary to the purpose to be served. It would, indeed, be a marked alteration of the American and English stand, in respect to extraterritorial jurisdiction, if in such a zone a vessel of foreign registry, or its master, should become subject to special penalties because the form of the manifest, beyond the necessary description of the cargo, did not conform to a regulation of a department of government as is contemplated in section 431. Congress in the Tariff Act has wisely made no such assertion of absolute domestic regulation in detail until the vessel has "arrived" in the United States.

The case of Phile v. The Anna, 1 Dall. 197, 1 L. Ed. 98, cited by the court in The Irene C, supra, is not in conflict with this interpretation. In that case the Anna, whose inadequate manifest was involved, was not in extraterritorial waters but was in the port of Philadelphia.

My interpretation of the law is that the master of a vessel from a foreign port, if within four leagues of our coast, may be required to produce his ship's papers, specifically the manifest, which he carries. If he cannot or does not, he becomes subject to a penalty of $500. If he produces a manifest, he has, in that regard, complied with the requirements of section 584. If the manifest produced does not reasonably describe the cargo carried, there are drastic penalties to cover that situation.

As the remaining objections which were interposed to the libel are of specific,

rather than of general, application or interest, they will not here be reviewed. I find that there was no irregularity or unfairness in the appraisal of the cargo. The form of the notice to the master, advising him that the vessel had become liable to the several penalties set forth, was sufficient because of the authority under section 594 (19 USCA § 1594) to enforce the collection of penalties by summary proceedings against the vessel. The Irene C (D. C.) 41 F.(2d) 288, supra; The Pesaquid (D. C.) 11 F.(2d) 308. A better practice would be, however, to notify the master, personally and directly, that he has become liable to, and that there have been assessed against him, the specific penalties for specified violations.

In arriving at the conclusions expressed in respect to the major issues involved in this case, I am alert to the importance and necessity of curbing the smuggling and importation of liquors in violation of our laws. I am convinced, however, that a vigorous adherence to sound legal principles of interpretation, leaving it to Congress to remedy any deficiencies in the law, is the only course which will stand the test of time.

A decree, dismissing the libel and discharging the vessel, may be submitted for approval and entry.