## THE DEAUVILLE.

District Court, S. D. Alabama.
April 29, 1931.

Alex C. Birch, U. S. Dist. Atty., and J. E. Meredith and D. R. Coley, Jr., Asst. U. S. Attys., all of Mobile, Ala.

Armbrecht, Hand & Twitty, of Mobile, Ala., for the schooner.

ERVIN, District Judge.

This is a libel filed against the British schooner, Deauville, charging violations of the Tariff Act.

In this case the Coast Guard cutter, Dallas, left the whistle buoy, St. Joseph Point, on the Florida coast, and ran a straight course for some sixteen miles. She observed the Deauville at anchor dead ahead when she was about three miles from the Deauville and continued on until she got near the Deauville when the Deauville weighed anchor and started up in a southerly direction. The Dallas then changed her course so as to intercept the Deauville and, shortly thereafter, intercepted and boarded her. She found the Deauville to be loaded with liquor in cases and no other cargo. She placed the master of the Deauville under arrest and took the Deauville in tow and brought her into the port of Mobile, where this libel was filed under sections 581, 583, 584, 585 of the Tariff Act (19 USCA §§ 481, 485–487), which charges unlading a part of the cargo, failure to deliver a manifest on demand, and leaving the collection district without reporting. It is undoubtedly true that the Deauville had unloaded a part of her liquor cargo after she started from Nassau, and there is much suspicion that this portion of the cargo was brought into the state of Florida. There is no direct proof on this subject, nor is there any sufficient evidence to convict the Deauville on this charge, and I therefore dismiss it.

Primarily, the whole case depends on the question of whether or not the Deauville had come within the twelve-mile limit of the Florida coast for the purpose of delivering liquor. The facts show that she cleared from Nassau for Anguilla Keyes with a cargo of liquor. There seem to be three places on the charts referred to as Anguilla Cayes or "Keyes," one to the east of Nassau and two to the west, but none of them being more than sand keyes having no port. The master of the boat testified that he, was agent of the liquor and had intended to deliver it at Anguilla Keyes to a green vessel which was to meet him there; that if the vessel didn't meet him there he was to go to another spot and from there to another spot, and if he didn't meet her there he was to go to Honduras.

The boat was found many miles north of any destined place he had been told to go to. He testified that he was blown out of his course by storm, his engine had gotten out of fix, and that he arrived where he had anchored some time during the night of December 26th, and his vessel was arrested the following day. He made a statement after his arrest which was taken down by a stenographer, in which statement he testifies: "The engine ain't running good and I got in sand and anchored about midnight Friday night and remained until next morning until the Engineer began to work on the engine for satisfaction and at three o'clock, the Engineer was still in the engine room getting the engine ready, and he told me that he would soon be ready. I said to him, 'all right.' Shortly after that, I looked around and saw an object keep coming in my direction. I said to the Engineer, 'Let's get under way, let's get going.' I told the Engineer to start his engine if he is ready. After a few minutes he started his engine and the engine stalled, but he kept on with it until he was able to get it in better condition and in fifteen minutes after we started, the Coast Guard came along side and passed right by us and turned back and came back along side and I stopped. The Captain made a reply to me, 'Get ready, I am going to tow you in.' I made a reply to him that I was 18 miles from the nearest point of land and he made a reply to me that I am 11¾. I didn't say anything else and one of the officers came aboard."

When examined as a witness in this case, he denied making the statement, "I got in sand."

On cross-examination as to the stenographic characters representing sand, a question was raised as to whether or not the master said, when he got in the "sand," or whether he got "soundings"; but Mr. Coley, who was present when the statement was made, testified that he said "sand" and not "soundings."

It was argued that by his statement that when he got in the sand, he meant that he got in the sand so his anchor would hold, instead of meaning that he struck bottom. If this were so, why should the master deny making the statement? Again the master testified that he reached the spot at which he anchored, on the night of the 26th of December.

When the vessel was seized on the 27th, the customs officers took charge of certain books and papers found on the vessel in the master's cabin. Among these papers was a book of blank paper, in which one of the leaves had been torn in two, but the torn sheet was found in the book. An examination of this sheet showed imprinting where the previous sheet had been written on in pencil which bore rather heavily on the sheet, so leaving the imprint of the pencil mark on the second sheet. The government submitted this second sheet to a finger print expert, who treated it with certain powders and in this way brought out figures showing a calculation as to the location of the vessel, giving practically the same latitude and longitude, and dated some four or five days before the master testified that he had arrived at this locality, thus showing that he had, in fact, been there four or five days longer than he had testified to. The master testified on examination that he made his observations and calculations so as to calculate the longitude and latitude daily; that he destroyed them as he had no use for them. In addition to this, the testimony on the stand by Lieutenant Edwin L. Whitfield shows that using the American Nautical Almanac found on board the Deauville, and taking the declination of the sun as shown by these calculations, they were made on December 21, 22, and 23. It was further shown that in the hold of the vessel where the liquor was stored right under the hatch there was a space in the cases of liquor indicating that a number of cases might have been taken out of the hatch, also his liquor cargo was short 16 cases.

The spot at which the Deauville was anchored was approximately opposite St. Andrews Bay on the Florida coast and easily accessible to small boats from this coast. The location of the spot at which the Deauville was anchored was arrived at by taking the course from the whistle buoy and the distance logged by the Dallas, and not by any observations, and the testimony showed that according to this course and distance run by the Dallas, the Deauville was inside the twelve-mile limit when anchored; while Archer, the master of the Deauville, testified that he was considerably outside the twelve-mile limit. The testimony showed that there was one sounding made by the Dallas at the time the Deauville was overhauled which showed 18 fathoms. Archer testified that he made a sounding too, and found 16 fathoms, and it was urged that the chart shows that this depth could not be found anywhere on this Florida coast near where the Deauville was anchored, within twelve miles of the shore. An examination of the chart shows that the soundings found thereon are at considerable distances and taking the surface under the sea as being the same as the surface of the land above the tidewater, I see no impossibility nor even improbability of there being spots at which a greater depth may be found than are ordinarily shown on the chart. Remembering also that when the Deauville saw the Dallas approaching, she was anchored and immediately hoisted her anchor and started in a southerly direction, which would take her further from the shore, I can see no reason why the Deauville should have done this had her Master not realized that she was in the twelve-mile limit. His whole testimony shows that he knew that his vessel would be in trouble if found within the twelve-mile limit.

Why should he have weighed anchor and ran further out if he was then outside the twelve-mile limit; why should he be found several hundred miles up the west coast of Florida and off his route, and in close proximity to the coast, and with 16 cases missing from his cargo, unless he went there for the purpose of delivering his cargo there?

Why should he state he had arrived at the point where he was anchored on the night of the 26th of December, when in fact he had been there for five or six days, and in a location where small boats could come out and get portions of his liquor cargo, unless he went there for that purpose?

Why should he state he ran into sand and later deny making the statement if he meant by it he ran into sand where he could anchor, besides, any one familiar with that subject knows that an anchor will drag in sand but sink into mud and hold.

Under all the circumstances, I conclude that the Deauville was bound to a place in the United States and was anchored within twelve miles of the Florida coast.

The Coast Guard demanded the manifest of the master of the Deauville, either at the time of seizure or on the way to Mobile, and it was not delivered. The master explained, as his reason for not delivering it, that he had kept it in a locker under his berth in his cabin, and the storm filled this locker with water which dissolved the manifest, but it was not washed overboard. He says he did have a manifest and had signed it. He did deliver to the Coast Guard a typewritten list of the liquor on board. This list was no manifest and was not signed by him. The testimony shows that several other papers were found in the locker as well as some supplies, and these papers were not dissolved.

The list of liquors, the ship's Transire, and her British Registry, and other papers were all produced and show no water damage. He says he kept these in his hand bag.

If he had a manifest, why was it separated from the other ship's papers, and hidden, and why was it dissolved when other papers, not as strong and well made as the paper it probably was made of, were not so dissolved?

Remembering that his clearance from Nassau was not to a port, but only to a spot on the sea, and that according to his own testimony he was to transship his cargo at sea, I can easily conclude that he never had a manifest but only the typewritten list of the liquor he had on board.

Then was he bound to a port or place in the United States?

Again remembering that his only cargo was liquor, that his clearance was to a spot in the sea, and he was found several hundred miles north of this spot and out of the way, and in close proximity to the Florida shore where he had no business to be, and evidently had been there or thereabouts four or five days when he says he got there the night before his seizure, and also that his cargo of liquor is 16 cases less than he started with, the conclusion is irresistible that he was bound for the place where he was found, a place in the United States.

Did the Deauville, a foreign vessel from a foreign port, arrive within the limits of a collection district of this country and depart or attempt to depart, except from stress of weather or other necessity, without making a report or entry as required?

I have already found that she was anchored within twelve miles off the Florida coast line laden with liquor and having no manifest.

When the Dallas was observed approaching, she weighed anchor and headed out to sea, and when overhauled, claimed to be eighteen miles off shore.

Could any one find from these facts an intent or purpose to make a report or entry in the collection district in which she was found?

It is urged that being over three miles from shore, and nearly twelve miles, she was not within a collection district.

This contention is met by Miller v. United States, 49 F.(2d) 368, Fourth Circuit, decided April 13, 1931.

The Deauville having no manifest, so not delivering any on demand, and the liquors on board being consigned to the master according to his testimony, and having been appraised by the customs officers of Mobile of the district at $15,854, and there being no testimony to the contrary, a decree will be entered in accordance with this opinion declaring the penalties and forfeiting the vessel.